IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 24-CR-00070-CJW-MAR |
| | ) | |
| vs. | ) | |
| | ) | |
| SHANE ROBERT McDOWELL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S BRIEF IN SUPPORT OF ITS RESISTANCE TO DEFENDANT'S MOTION TO SUPPRESS

The Court should deny defendant's motion to suppress. Defendant does not have standing to challenge the search of a vehicle in which he was merely a passenger. Even if he had standing, and assuming the search warrant was defective, as defendant argues, officers had probable cause and consent to stop and search the vehicle. Immediately prior to the traffic stop, defendant had distributed fifteen ounces of methamphetamine to a confidential source and the confidential source had placed the methamphetamine in the trunk of his/her vehicle at the direction of investigators. Notwithstanding probable cause and consent, the search warrant in this case was valid and, even if it was defective, the exclusionary rule is not appropriate in this case. Defendant's Fourth Amendment rights were not violated, and the methamphetamine seized and defendant's post-*Miranda* statements should not be suppressed.

# TABLE OF CONTENTS

I. BACKGROUND ........................................................................................ 2

   A.    February 5, 2024 Controlled Purchase from Defendant ...................... 2

   B.    February 13, 2024 Controlled Purchase from Defendant ................... 3

   C.    February 28, 2024 Search Warrant, Controlled Purchase from Defendant, Traffic Stop, and Interview ............................................... 4

      1.    Search Warrant ............................................................................ 4

      2.    Controlled Purchase from Defendant ............................................ 10

      3.    Traffic Stop and Interview ........................................................... 11

      4.    Return of Search Warrant ............................................................ 12

II. ANALYSIS ............................................................................................. 13

   A.    Defendant Lacks Standing to Challenge Search of CS1's Vehicle ... 13

   B.    Even if Defendant Had Standing, and Assuming the Search Warrant Was Defective, Officers Had Probable Cause and Consent to Stop and Search CS1's Vehicle ................................................................. 14

      1.    Officers Had Reasonable Suspicion to Stop CS1's Vehicle and Probable Cause to Search It ......................................................... 14

   C.    Officers Had Consent to Stop and Search CS1's Vehicle ................. 17

   D.    Even if Defendant Had Standing, the Search Warrant was Valid, And, If Not, The Exclusionary Rules is Not Appropriate ........................... 18

      1.    The Search Warrant Complied with the Fourth Amendment ....... 19

      2.    A Technical Violation in the Execution of the Search Warrant is not a Fourth Amendment Violation ............................................ 23

      3.    The Exclusionary Rule is Not Appropriate in this Case ............... 25

III. CONCLUSION ...................................................................................... 28

## I. BACKGROUND

### A. February 5, 2024 Controlled Purchase from Defendant

On February 5, 2024, law enforcement conducted a controlled purchase of methamphetamine from defendant, utilizing a confidential source (hereinafter referred to in this affidavit as "CS1"). (Exhibit 1, at 1, 5.) Before the controlled purchase, CS1 consented to a strip search of his/her person and a search of his/her

2

vehicle, and officers provided him/her with $1,400 in pre-serialized United States currency and a hidden body transmitter. (Exhibit 1, at 2, 5.) Officers also placed a global positioning system ("GPS") device on CS1's vehicle to track CS1's movements. (Exhibit 1, at 2.) CS1 drove to a residence on Orange Street in Tipton, Iowa, where defendant entered CS1's vehicle. (Exhibit 1, at 2, 5.) CS1 and defendant then drove to Cedar Rapids, Iowa, in CS1's vehicle. (Exhibit 1, at 2, 5.) After they arrived, they parked in a parking lot of a restaurant and defendant attempted to contact a source of supply of methamphetamine. (Exhibit 1, at 2, 5.) Defendant's source in Cedar Rapids did not answer, so defendant called C.E., a source of supply of methamphetamine in Iowa City, Iowa. (Exhibit 1, at 3, 5.) CS1 and defendant then traveled to C.E.'s residence in Iowa City in CS1's vehicle. (Exhibit 1, at 3, 5.) After they arrived, CS1 provided defendant with the $1,400 in pre-serialized United States currency and defendant met with C.E. (Exhibit 1, at 3, 5.) When defendant returned to CS1's vehicle, defendant gave CS1 two ounces of methamphetamine and returned $500 of the $1,400. (Exhibit 1, at 3, 5.) Following the transaction, defendant stayed at C.E.'s residence and CS1 met with investigators, where CS1 provided investigators with the two ounces of methamphetamine and $500. (Exhibit 1, at 3, 5.) Officers then conducted a strip search of CS1 and searched his/her vehicle. (Exhibit 1, at 3-4, 5.)

### B. February 13, 2024 Controlled Purchase from Defendant

On February 13, 2024, law enforcement conducted a controlled purchase of methamphetamine from defendant, utilizing CS1. (Exhibit 2, at 1, 4.) Before the

3

controlled purchase, CS1 consented to a strip search of his/her person and a search of his/her vehicle, and officers provided him/her with $200 in pre-serialized United States currency and a hidden body transmitter. (Exhibit 2, at 2, 4.) CS1 drove to a residence on West 2nd Street in Tipton, and, after he/she arrived, defendant entered CS1's vehicle. (Exhibit 2, at 2, 4.) After defendant entered CS1's vehicle, defendant knowingly and intentionally distributed methamphetamine to CS1 in exchange for $200. (Exhibit 2, at 2, 4.) Following the transaction, CS1 met with investigators, where CS1 provided investigators with the methamphetamine he/she purchased from defendant. (Exhibit 2, at 2, 4 Officers then conducted a strip search of CS1 and searched his/her vehicle.. (Exhibit 2, at 2, 4.)

### C. February 28, 2024 Search Warrant, Controlled Purchase from Defendant, Traffic Stop, and Interview

#### 1. Search Warrant

In the afternoon of February 28, 2024, Detective Matt Jackson of the Cedar County Sherriff's Office obtained a search warrant for defendant's person, two vehicles associated with defendant, and "any vehicle" that defendant was "found to currently or immediately before had been driving or riding in." (Exhibit 3, at 1, 3-19.) The affidavit in support of the search warrant established the following.

In September 2023, investigators conducted a federal proffer interview of R.R. (Exhibit 3, at 7.) R.R. had been in a long-term relationship with defendant for approximately six years. (Exhibit 3, at 7.) R.R. stated that defendant was involved with using and/or distributing methamphetamine during the entirety of the six years they were together, and R.R. provided specific details as to the weights and

frequency of defendant's "methamphetamine purchases from several different sources." (Exhibit 3, at 7.) One of defendant's sources was K.H., who lived in Marion, Iowa. (Exhibit 3, at 7.)

In October 2023, a confidential source (hereinafter referred to as "CS2") contacted law enforcement and stated that CS2 could purchase controlled substances from multiple individuals, including W.S. (Exhibit 3, at 6.) A couple days after the interview, law enforcement conducted a controlled purchase of methamphetamine from W.S., utilizing CS2. (Exhibit 3, at 6.) Before W.S. distributed the methamphetamine to CS2, W.S. utilized a black 2006 Dodge Grand Caravan, which was registered to W.S., to obtain methamphetamine from an unknown source. (Exhibit 3, at 6-7.)

On October 30, 2023, Det. Jackson observed defendant driving W.S.'s black Caravan. (Exhibit 3, at 7.) Defendant was known to law enforcement as a methamphetamine user and distributor, and, in January 2023, defendant pled guilty to possession with intent to deliver methamphetamine, a class D felony. (Exhibit 3, at 7.)

In early November 2023, law enforcement conducted another controlled purchase from W.S., utilizing CS2. (Exhibit 3, at 7.) Based upon W.S.'s conversation with CS2 in arranging the controlled purchase, law enforcement believed that W.S. was middling for a "male subject," "meaning she will get the controlled substance from her source, and promptly deliver the controlled substance

for cash." (Exhibit 3, at 7.) Shortly before W.S. distributed the methamphetamine to CS2 during the controlled purchase, W.S. met with defendant. (Exhibit 3, at 7.)

W.S. and defendant lived together at a residence on West 2nd Street in Tipton, Iowa. (Exhibit 3, at 9.)

In November 2023, investigators obtained search warrants for GPS tracking of W.S.'s black 2006 Dodge Grand Caravan and a red 2000 Chevy Tahoe, which was registered to J.H. but driven by defendant. (Exhibit 3, at 7-8.) On November 18, 2023, data from the GPS tracker affixed to W.S.'s Caravan showed that it traveled to Cedar Rapids and made a number of stops. (Exhibit 3, at 8.) One of those stops was close to the Linn County Jail, and Det. Jackson confirmed that defendant stopped at the Linn County Jail on that date and put $20 onto R.R.'s commissary. (Exhibit 3, at 8.) The Caravan also made two separate stops in the area of 7th Street and 2nd Avenue SW in Cedar Rapids, the area of K.H.'s residence. (Exhibit 3, at 8.) K.H. had moved from Marion to an apartment on 2nd Avenue SW in Cedar Rapids. (Exhibit 3, at 7-8.)

A couple days before November 18, 2023, law enforcement executed a search warrant at K.H.'s apartment in Cedar Rapids and seized approximately a half-pound of methamphetamine. (Exhibit 3, at 8.) K.H. was not arrested. (Exhibit 3, at 8.) K.H.'s phone was seized during the execution of the search warrant, and a search of K.H.'s phone showed approximately twenty contacts between K.H. and defendant. (Exhibit 3, at 8.)

6

In late November 2023, investigators conducted a controlled purchase of methamphetamine from W.S., utilizing CS2.  (Exhibit 3, at 8.)

On November 29, 2023, data from the GPS tracker affixed to W.S.'s Caravan showed that it made an approximately ten-minute stop in the 700 block of 2nd Avenue SW in Cedar Rapids, the area of K.H.'s apartment.  (Exhibit 3, at 8.)

On December 4, 2023, data from the GPS tracker affixed to the Chevy Tahoe driven by defendant showed that the Tahoe stopped in the area of K.H.'s apartment for approximately twenty minutes, and it made other stops in Cedar Rapids, including a grocery store, gas station, and the Linn County Jail.  (Exhibit 3, at 8.)

Between December 8, and December 18, 2023, CS1 had multiple conversations with defendant via cellphone to arrange a controlled purchase of methamphetamine.  (Exhibit 3, at 9.)

On December 14, 2023, investigators received a search warrant return related to W.S.'s Facebook account, and a review of the records showed that W.S. had made comments about defendant assisting her with her methamphetamine sales.  (Exhibit 3, at 9.)

Officers were monitoring jail calls between T.D. and B.M., and their conversation indicated that B.M. was in possession of W.S.'s Caravan and W.S. and/or defendant had obtained a black GMC Sierra.  (Exhibit 3, at 9.)  The GPS tracker affixed to W.S.'s Caravan corroborated that B.M. had the Caravan. (Exhibit 3, at 9.)

Investigators then noticed a black GMC Sierra and a black Chevy Equinox at W.S.'s and defendant's residence on West 2nd Street in Tipton. (Exhibit 3, at 9.) Recorded jail calls between R.R. and defendant indicated that the Equinox was broken down. (Exhibit 3, at 9.)

On December 17, 2023, data from the GPS tracker affixed to the Tahoe driven by defendant showed that it appeared to be broken down on Highway 30 in Linn County for approximately two hours. (Exhibit 3, at 9.) Investigators believed that the Tahoe was unreliable. (Exhibit 3, at 9.)

On December 18, 2023, investigators placed another GPS tracker on the Tahoe driven by defendant; however, on December 21, 2023, the GPS tracker stopped working. (Exhibit 3, at 9.) On December 24, 2023, investigators spoke with defendant as he was working on his Tahoe at his residence, and defendant admitted that he found the GPS tracker. (Exhibit 3, at 9.)

In early February 2023, CS1 conducted a controlled purchase of methamphetamine from defendant at the direction of law enforcement. (Exhibit 3, at 10.) During the controlled purchase, defendant "admitted to conducting several recent transactions for bulk amounts of methamphetamine in Cedar Rapids." (Exhibit 3, at 10.)

In mid-February 2023, CS1 conducted another controlled purchase of methamphetamine from defendant at the direction of law enforcement. (Exhibit 3, at 10.)

8

On February 22, 2024, Det. Jackson observed defendant driving a white Saturn Outback registered to Whitney McDowell, whom defendant had lived with for a short period of time and may have been living with at the time the search warrant was obtained. (Exhibit 3, at 10.)

Based upon Det. Jackson training and experience, he knows, in part, that "drug traffickers will keep the controlled substances they intend to sell, as well as packaging materials, and the proceeds of their sales either on their person, in their vehicles, or in their residences or other structures they have control over." (Exhibit 3, at 13.)

A magistrate judge of the Seventh Judicial District of Iowa signed the search warrant on February 28, 2024, directing "any Peace Officer in the State" that the magistrate judge had "found that probable cause exists" to search:

**Vehicle(s)**
- Red 2000 Chevrolet Tahoe bearing Iowa license plate [redacted] and VIN [redacted], registered to [J.H.] at [XXXX] 205th Street, Tipton, Iowa.

- White 2007 Saturn Outlook bearing Iowa license plate [redacted] and VIN [redacted], registered to WHITNEY MCDOWLL at [XXX] 9th Avenue, Clarence, Iowa.

- Any vehicle that SHANE MCDOWELL is found to currently or immediately before had been driving or riding in.

**Person(s)**
- The person of SHANE ROBERT MCDOWELL, DOB [XX]/[XX]/1980. [Photograph of defendant]

(Exhibit 3, at 17.) The search warrant stated that, "In Cedar County, there is now certain property," and it listed, among other things, "Methamphetamine,

9

marijuana, or any controlled substances as listed in Chapter 124 of the State Code of Iowa[.]" (Exhibit 3, at 17-18.) The search warrant commanded any Peace Officer of the State to "make immediate search" of the described vehicles and person "for the specified property." (Exhibit 3, at 19.)

### 2. Controlled Purchase from Defendant

Later on February 28, 2024, law enforcement conducted a controlled purchase of methamphetamine from defendant, utilizing CS1. (Exhibit 4, at 1.) At approximately 5:34 p.m., Detective Tanner Bohling conducted a "safety briefing" at the Cedar County Sheriff's Office" with officers and investigators. (Exhibit 4, at 2.)

At approximately 5:44 p.m., Detective Sheridan Billhorn conducted a "safety briefing" at the Cedar Rapids Police Department ("CPRD") with other investigators and officers, including Officers Austin Bailey and Skylar Mullins of CRPD. (Exhibit 4, at 2.)

Around that same time, investigators in Cedar County met with CS1. (Exhibit 4, at 2.) CS1 consented to a strip search of his/her person and a search of his/her vehicle, and officers provided him/her with $3,500 in pre-serialized United States currency and a hidden body transmitter. (Exhibit 4, at 2-3.) Officers also placed a GPS device on CS1's vehicle to track CS1's movements. (Exhibit 4, at 2.)

CS1 then drove to a residence on West 2nd Street in Tipton, and defendant entered CS1's vehicle. (Exhibit 4, at 3.) CS1 and defendant drove to Cedar Rapids, parking at a car wash. (Exhibit 4, at 3.) Defendant called his supplier, who told

10

defendant that he would be there in about five minutes, and CS1 gave defendant the $3,500 in pre-serialized United States currency. (Exhibit 4, at 3.)

Officers conducting physical and electronic surveillance observed CS1 and defendant drive from the car wash to the parking lot of a store, where defendant met with Andre McNairy, defendant's source of supply. (Exhibit 4, at 4.) When defendant returned to CS1's vehicle, defendant knowingly and intentionally distributed approximately fifteen ounces of methamphetamine to CS1, telling CS1 that defendant's source kept an ounce for himself. (Exhibit 4, at 4.) Det. Bohling instructed CS1 to place the methamphetamine in the trunk in the spare tire compartment of CS1's vehicle. (Exhibit 4, at 4.) Officers conducting physical and electronic surveillance then observed CS1 drive back to the car wash, where he/she put the methamphetamine he/she obtained from defendant in the truck of his/her vehicle in the spare tire compartment. (Exhibit 4, at 4.)

### 3. Traffic Stop and Interview

After CS1 stored the methamphetamine in the spare tire compartment of CS1's vehicle, CS1 and defendant started driving back to Cedar County, Iowa. (Exhibit 4, at 4.) Officers Bailey and Mullins of CRPD, who were present during the safety briefing, were directed to conduct a traffic stop of CS1's vehicle as it was about to drive onto Highway 30 in Cedar Rapids. (Exhibit 5, at 2.) During the traffic stop, defendant was detained in handcuffs and officers searched CS1's vehicle, locating the methamphetamine in the trunk in the spare tire compartment.

11

(Exhibit 5, at 2.)  Defendant was then arrested and transported to CRPD. (Exhibit 5, at 2.)

After he was transported to CRPD, officers interviewed defendant. (Exhibit 5, at 4.)  Officers informed defendant of his *Miranda* rights, and defendant signed a form acknowledging his rights.  (Exhibit 5, at 4.)  Defendant stated that he had been a user of methamphetamine for the last six to eight years.  (Exhibit 5, at 4.)  Defendant admitted that CS1 picked defendant up in Tipton, and they drove to Cedar Rapids, where defendant met with "Shorty" (McNairy) and obtained fifteen ounces of methamphetamine in exchange for $3,500 that CS1 had given defendant. (Exhibit 5, at 4-5.)  Defendant reported that he met "Shorty" through K.H., and that defendant had obtained methamphetamine from "Shorty" two to three times in the past two to four months.  (Exhibit 5, at 5.)  Defendant further admitted that he had distributed methamphetamine to CS on an earlier occasion.  (Exhibit 5, at 5.)

### 4. Return of Search Warrant

On April 18, 2024, Det. Jackson returned the search warrant to a Judge of the Seventh Judicial District of Iowa, attaching an inventory of the property seized pursuant to the warrant.  (Exhibit 3, at 20-21.)  The inventory listed the property seized from CS1's vehicle and defendant's person during the February 28, 2024 traffic stop in Linn County, Iowa.  (Exhibit 3, at 21.)

12

## II.   ANALYSIS

### A.  Defendant Lacks Standing to Challenge Search of CS1's Vehicle

Defendant seeks suppression of "the controlled substances found as a result of the search of the vehicle in which Mr. McDowell was a passenger on February 28, 2024" (Doc. 24, at 2); however, defendant lacks standing to challenge the search of CS1's vehicle.  Defendant was merely a passenger and had no expectation of privacy in CS1's vehicle.

"It is well-established that 'Fourth Amendment rights are personal rights that may not be asserted vicariously.'"  *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)).  "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'"  *Barragan*, 379 F.3d at 529 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).  "The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search."  *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  *Barragan*, 379 F.3d at 529-30 (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

"As a general matter, mere passengers . . . who have no ownership rights in a vehicle lack standing to challenge a search of the vehicle."  *United States v. Lindsey*,

43 F.4th 843, 847 (8th Cir. 2022) (citing *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017)). "A passenger who asserts 'neither a property nor a possessory interest' in a vehicle lacks a reasonable expectation of privacy in that vehicle." *United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) (quoting *Rakas v. Illinois*, 439 U.S. 128, 148 (1978)). "Even where a search is unlawful, a passenger without such an interest in the vehicle normally cannot challenge its search or suppress resulting evidence." *Id.* (citing *Anguiano*, 795 F.3d at 878-79).

Here, defendant cannot challenge the search of CS1's vehicle or suppress his post-*Miranda* statements because he lacks standing. Defendant was a mere passenger in CS1's vehicle, and he did not have a reasonable expectation of privacy.

**B. Even if Defendant Had Standing, and Assuming the Search Warrant Was Defective, Officers Had Probable Cause and Consent to Stop and Search CS1's Vehicle**

Even assuming for the sake of argument that defendant has standing and that the search warrant was defective, as defendant argues, officers did not violate defendant's Fourth Amendment rights because officers had probable cause and consent to conduct a warrantless seizure and search of CS1's vehicle.

**1. Officers Had Reasonable Suspicion to Stop CS1's Vehicle and Probable Cause to Search It**

After observing defendant meet with his source of supply and observing and overhearing defendant distribute fifteen ounces of methamphetamine to CS1, officers had probable cause to conduct a traffic stop of CS1's vehicle and to search it.

"The Fourth Amendment permits investigative traffic stops when law enforcement has reasonable suspicion of criminal activity." *United*

14

*States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016) (citing *Navarette v. California*, 572 U.S. 393, 396-97 (2014)). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (internal quotation marks omitted) (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). Courts "'assess whether a law enforcement official had reasonable suspicion of criminal activity based on the totality of the circumstances,' *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017), 'keeping in mind that officers may draw on their experience and training to make inferences from the information they have,' *United States v. Cabo-Cabo*, 873 F.3d 613, 617 (8th Cir. 2017)." *United States v. Lopez-Tubac*, 943 F.3d 1156 (8th Cir. 2019). "The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008).

"Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016). "An officer has probable cause if, 'given the totality of the circumstances, a reasonable person could believe that there is a fair probability that contraband or evidence of a crime would be found in a particular place.'"

*United States v. Pacheco*, <u>996 F.3d 508, 513</u> (8th Cir. 2021). "Probable cause may be

based on the collective knowledge of all law enforcement officers involved in an

investigation and need not be based solely upon the information within the

knowledge of the officer on the scene if there is some degree of communication."

*United States v. Wells*, <u>347 F.3d 280, 287</u> (8th Cir. 2003) (quotation and citation

omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it

justifies the search of every part of the vehicle and its contents that may conceal the

object of the search." *United States v. Ross*, <u>456 U.S. 798, 825</u> (1982). A search may

be authorized under the automobile exception even when law enforcement obtains a

search warrant later determined to be invalid. *United States v. Martinez*, <u>78 F.3d

399, 401</u> (8th Cir. 1996); *see United States v. Holleman*, <u>743 F.3d 1152, 1158</u> (8th

Cir. 2014) ("[A]ny infirmities in the search warrant application are irrelevant so

long as the search of the vehicle fell within the automobile exception to the search

warrant requirement.")

    Here, Officers Bailey and Mullins of CRPD were present during the safety

briefing at CRPD, where it was explained that investigators were going to conduct a

controlled purchase of methamphetamine from defendant. Officers Bailey and

Mullins monitored radio traffic during the controlled purchase, and other members

of the investigative team watched and listened as defendant obtained

methamphetamine from McNairy and distributed it to CS1, who put it in the truck

in the spare tire compartment of CS1's vehicle. Officers Bailey and Mullins were

then directed to conduct a traffic stop of CS1's vehicle. During the traffic stop,

officers located and seized the methamphetamine that CS1 had obtained from defendant and placed in the trunk.

Therefore, even if defendant had standing and the search warrant was defective, officers had probable cause to stop and search CS1's vehicle based upon the physical and electronic surveillance of the controlled purchase from defendant. Officers knew that defendant had distributed fifteen ounces of methamphetamine to CS1 and that CS1 had placed the methamphetamine in the trunk of CS1's vehicle.

### C. Officers Had Consent to Stop and Search CS1's Vehicle

During the controlled purchase, CS1 was acting at the direction of law enforcement and a reasonable officer would believe that CS1 consented to a traffic stop of CS1's vehicle and a search of it.

"A warrantless search is valid under the Fourth Amendment if it is conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Brown*, 763 F.2d 984, 987 (8th Cir. 1985). "To show that a person consented to a search, the Government must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 895 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). "Consent . . . may be inferred from the subject's 'words, gestures, and other conduct.'" *Id.* (quoting *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001)). "The issue turns not on the" subject providing consent's "subjective state of mind, but on whether the officer reasonably believed the" subject "consented." *Id.* at 893.

17

Here, the February 28, 2024 controlled purchase was CS1's third controlled purchase from defendant at the direction of law enforcement. During the first two controlled purchases, CS1 consented to a strip search and a search of his/her vehicle before and after the controlled purchase, and, during the February 5 controlled purchase, CS1 consented to officers placing a GPS tracking device on his/her vehicle. Officers had explained to CS1 that the searches of his/her person and vehicle were part of the operating procedure during a controlled purchase, and CS1 consented to it every time. At the onset of the February 28 controlled purchase, CS1 again consented to a strip search and a search of his/her vehicle before the controlled purchase, and CS1 consented to officers placing a GPS tracking device on his/her vehicle. During the February 28 controlled purchase, Det. Bohling directed CS1 to place the methamphetamine CS1 obtained from defendant in the trunk in the spare tire compartment of CS1's vehicle.

At the time of the February 28 traffic stop, CS1 was acting on behalf of law enforcement, and, given the history of searches of CS1 and his/her vehicle and CS1's understanding of the operating procedure, a reasonable officer would believe that CS1 consented to a traffic stop and search of his/her vehicle to effectuate the conclusion of the controlled purchase.

Therefore, even if defendant had standing and the search warrant was defective, officers had CS1's consent to initiate a traffic stop on his/her vehicle and to conduct a search of it.

### D. Even if Defendant Had Standing, the Search Warrant was Valid, And, If Not, The Exclusionary Rules is Not Appropriate

18

### 1. The Search Warrant Complied with the Fourth Amendment

Given the totality of the circumstances, the search warrant complied with the requirements of the Fourth Amendment as it particularly described the places to be searched and the things to be seized and it was supported by probable cause. The search warrant affidavit established that defendant was a long-time drug trafficker, and he had utilized different vehicles for drug-related activities.

In a federal prosecution, courts "'evaluate a challenge to a search conducted by state authorities under federal Fourth Amendment standards.'" *United States v. Cote*, 569 F.3d 391, 393 (8th Cir. 2009) (quoting *United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994)). "[F]ederal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations." *United States v. Appelquist*, 145 F.3d 976, 978 (8th Cir. 1998).

"'The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a "particular[] descri[ption of] the place to be searched, and the persons or things to be seized," and (3) be based "upon probable cause, support by Oath or affirmation,"'" *Skarda*, 845 F.3d at 375 (quoting *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (in turn quoting U.S. Const. amend. IV)).

"The particularity requirement prevents officers from conducting 'a general exploratory rummaging of a person's belongings.'" *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (quoting *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992)). "The requirement is one of 'practical accuracy rather than a

hypertechnical one.'" *Id.* (quoting *United States v. Schave*, <u>55 F.4th 671, 675</u> (8th Cir. 2022)). "In assessing whether a warrant is sufficiently particular," courts "consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Id.* (citing *Schave*, <u>55 F.4th at 675</u>).

"Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, <u>921 F.3d 751, 757</u> (8th Cir. 2019) (quoting *Illinois v. Gates*, <u>462 U.S. 213, 230</u>, <u>238</u> (1983)). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, <u>540 U.S. 366, 370</u> (2003) (internal quotations and citations omitted). "[T]he mere 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity,' is all that is required." *United States v. Winarske*, <u>715 F.3d 1063, 1067</u> (8th Cir. 2013) (quoting *United States v. Mendoza*, <u>421 F.3d 663, 667</u> (8th Cir. 2005)).

An issuing magistrate judge's "'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, <u>462 U.S. at 236</u> (quoting *Spinelli v. United States*, <u>393 U.S. 410, 419</u> (1969)). In reviewing the issuance of a warrant, a reviewing court "need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*,

407 F.3d 942, 948 (8th Cir. 2005). "When a magistrate [judge] relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (internal quotations and citation omitted).

The search warrant in this case complied with the Fourth Amendment. First, the search warrant was issued by a neutral and detached magistrate judge of the Seventh Judicial District of Iowa.

Second, the search warrant contained a particular description of the places to be searched and the things to be seized. For the places to be searched, it described two specific vehicles by license plate and vehicle identification number, described defendant's person by his date of birth and photo, and it described any vehicle that defendant "is found to currently or immediately before had been driving or riding in." For the things to be seized, it listed fifteen different types of property, including "[m]ethamphetamine, marijuana, or any controlled substances listed in Chapter 124 of the State Code of Iowa[.]"

Third and finally, it established probable cause that contraband or evidence of a crime would be found in the vehicles or on defendant's person. The search warrant affidavit established that (1) defendant had been using and distributing methamphetamine for the entirety of the six years he was in a relationship with R.R.; (2) defendant was a methamphetamine source of supply for W.S., and officers had conducted controlled purchases of methamphetamine from W.S.; (3) defendant

had traveled to Cedar Rapids to acquire methamphetamine in different vehicles, including W.S.'s Dodge Grand Caravan and a red Chevy Tahoe; (4) defendant no longer had access to W.S.'s Dodge Grand Caravan and the red Chevy Tahoe had broken down and was unreliable; (5) defendant had access to several additional vehicles, including a black GMC Sierra and a white Saturn Outback registered to Whitney McDowell, whom defendant had lived with for a short period of time and may have been living with at the time the search warrant was obtained; and (6) drug traffickers keep controlled substances intend to sell, packaging materials, and the proceeds of their sales on their persons or in their vehicles.

Defendant argues that "[t]here was no probable cause to believe that any contraband or other relevant evidence would be found in 'Any vehicle that SHANE McDOWELL is found to currently or immediately before had been driving or riding it.'" (Doc. 24-1, at 7.) Given the totality of the circumstances, however, defendant's argument fails. The search warrant affidavit established that defendant was a long-time user and trafficker of methamphetamine, that he utilized multiple vehicles in conducting drug-related activities, and that drug traffickers keep controlled substances they intend to sell and proceeds of their sales on their persons or in their vehicles. There was probable cause to believe that contraband or any other evidence would be found in any vehicle defendant was in, or had immediately exited, based upon his drug trafficking activities.

Given the totality of the circumstances, the search warrant obtained and executed in this case satisfied the requirements of the Fourth Amendment as it

22

particularly described the places to be searched and the things to be seized and it was supported by probable cause.

### 2. A Technical Violation in the Execution of the Search Warrant is not a Fourth Amendment Violation

Defendant argues that the search warrant was limited to items found in Cedar County, and officers exceeded the scope of the warrant when they executed it in Linn County. (Doc. 24-1, at 9-11.) This is a technical violation in the execution of the warrant, and, since the warrant otherwise complies with the Fourth Amendment, suppression is not appropriate.

Under Iowa law, a magistrate judge shall issue a warrant upon a finding of probably cause, "directed to any peace officer, commanding that peace officer forthwith to search the named person, place, or thing *within the state* for the property specified, and to bring any property seized before the magistrate." Iowa Code § 808.4 (emphasis added); *see State v. Groff*, 323 N.W.2d 204, 213 (Iowa 1982) (finding that Iowa magistrate judges have the authority to issue a search warrant for any person, place, or thing within the state for the property specified).

The Eighth Circuit has held that a technical violation in the execution of a search warrant is not a basis for suppression so long as the warrant otherwise compiles with the Fourth Amendment. In *United States v. Faulkner*, 826 F.3d 1139 (8th Cir. 2016), officers obtained "a warrant to place GPS tracking devices on either or both of Faulkner's two vehicles." *Id.*, at 1143. "The warrant and resulting order specified that the device could be placed on either of Faulkner's vehicles located in Hennepin County (Minneapolis), but the officers ultimately placed the device on one

23

of the vehicles . . . while it was in Ramsey County, in the City of St. Paul." *Id.* The defendant argues that all evidence from the GPS warrant should have been suppressed because, in relevant part, "execution of the warrant outside the geographical limitations set forth in the warrant transformed the installation of the GPS tracking device into a warrantless search" and it violated state law. *Id.*, at 1144.

The Eighth Circuit held that "[t]he technical deficiency that the warrant specified a certain county for placement of the GPS device when it was actually placed in a neighboring county might be a violation of state law, but it is not a Fourth Amendment violation under these circumstances." *Faulkner*, 826 F.3d at 1145-46 (citing *United States v. Freeman*, 897 F.2d 346, 350 (8th Cir. 1990) (holding no Fourth Amendment violation for technical violation in execution of the warrant because it did not implicate probable cause or the description with particularly of the place to be searched, and, the violation was not deliberate); *United States v. Bach*, 310 F.3d 1063, 1066 (8th Cir. 2002) (state law violations were not a basis for suppression without a Fourth Amendment violation)); *see also United States v. Green*, 178 F.3d 1099, 1106 (10th Cir. 1999) ("The Fourth Amendment is satisfied where, as here, officers obtain a warrant, grounded in probable cause and phrased with sufficient particularity, from a magistrate of the relevant jurisdiction authorizing them to search a particular location, even if those officers are acting outside their jurisdiction as defined by state law."). The Eighth Circuit found that the warrant complied with the Fourth Amendment because (1) it was "approved by

a neutral magistrate" judge, (2) "[t]he installation authorized by the warrant was executed within the specified time frame;" and (3) "[t]he warrant application particularly described Faulkner's Avalanche by year, make, model, color, license plate, and VIN number." *Faulkner*, 826 F.3d at 1145.

Like the warrant in *Faulkner*, the warrant in this case was approved by a neutral magistrate judge, particularly described the places to be searched and the property to be seized, and it was supported by probable cause. While defendant is correct that the warrant was limited to certain property in "Cedar County" and it was executed in Linn County, under *Faulkner*, that is a technical violation and not a basis for suppression. Moreover, the magistrate judge's restriction to property in "Cedar County" was a violation of state law as Iowa Code requires magistrate judges to direct any peace officer in the state to search "the named person, place, or thing" *within the state* for the property specified.

Since the warrant in this case complies with the Fourth Amendment, a technical violation in the execution of the warrant does not require suppression.

### 3.  The Exclusionary Rule is Not Appropriate in this Case

#### a.  The Good-Faith Exception to the Exclusionary Rule Applies

Even if the Court finds that the search warrant lacked probable cause, the Court should find that the *Leon* good-faith exception to the exclusionary rule applies.

The *Leon* good-faith exception to the exclusionary rule applies "when an officer acting with objective good faith has obtained a search warrant from a judge

25

or magistrate and acted within its scope,' even if the warrant is subsequently invalidated." *United States v. Cannon*, <u>703 F.3d 407, 412</u> (8th Cir. 2013) (quoting *United States v. Leon*, <u>468 U.S. 897, 920-21</u> (1984)).  The good faith determination is restricted "to the objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, <u>784 F.3d 1227, 1231</u> (8th Cir. 2015).  The Supreme Court has identified four situations in which the exception is not available:

> (1) When "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";

> (2) When "the issuing magistrate wholly abandoned his judicial role";

> (3) When the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

> (4) When "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Leon*, <u>468 U.S. at 923</u> (internal citations omitted).

Here, none of the four exceptions apply in this case: (1) there is no indication that the affiant mislead the issuing court; (2) there is no basis for finding the issuing court abandoned a judicial role; (3) even if the Court finds the affidavit lacked probable cause to search any vehicle that defendant was in or had recently exited, the affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant specifically identifies the

placed to be searched and items to be seized that are easily linked to a criminal investigation.

### b. The Inevitable Discovery Exception to the Exclusionary Rule Applies

Even if the Court finds that the search warrant lacked probable cause, the Court should not exclude the evidence seized from CS1's vehicle as, if the search would not have occurred, investigators would have seized the methamphetamine in Cedar County after CS1 dropped defendant off at his residence.

"The inevitable-discovery doctrine posits that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppress under the exclusionary rule, ultimately or inevitable would have been discovered by lawful means, then the exclusionary rule does not apply." *United States v. James*, 353 F.3d 606, 616-17 (8th Cir. 2003) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Under that doctrine, "the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997).

Here, there is a reasonable probability that the methamphetamine seized from CS1's vehicle would have been discovered by lawful means in the absence of police misconduct as officers would have obtained the methamphetamine from CS1 at the conclusion of the controlled purchase. The government was also actively

pursuing a substantial, alternative line of investigation at the time of the constitutional violation as they were in the middle of conducting a controlled purchase utilizing CS1.  Since it would have been seized anyway, the Court should not suppress it.

## III.  CONCLUSION

For the above stated reasons, the Court should deny defendant's motion to suppress.

Respectfully submitted,

CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2024 I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: /s/   DRE

TIMOTHY T. DUAX
United States Attorney

By: */s/ Dillan Edwards*

DILLAN EDWARDS
Assistant United States Attorney
111 7th Street, SE Box 1
Cedar Rapids, IA 52401
(319) 363-6333
(319) 363-1990 - fax
Dillan.Edwards@usdoj.gov