```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF IOWA
 2

 3   UNITED STATES OF AMERICA,    )
                                  )
 4              Plaintiff,        )
                                  )
 5        VS.                     )     24-CR-70
                                  )
 6   SHANE McDOWELL,              )
                                  )
 7              Defendant.        )

 8

 9                      APPEARANCES:

10   ATTORNEYS DILLAN EDWARDS AND JARED MANTERNACH, U.S.
     Attorney's Office, 111 Seventh Avenue S.E., Box 1, Cedar
11   Rapids, Iowa 52401, appeared on behalf of the United
     States.
12
     ATTORNEY WEBB L. WASSMER, Wassmer Law Office, 5320
13   Winslow Road, Marion, Iowa 52302, appeared on behalf of
     the Defendant.
14

15              HEARING ON MOTION TO SUPPRESS,

16         HELD BEFORE THE HON. MARK A. ROBERTS,

17   on the 29th day of October, 2024, at 111 Seventh Avenue

18   S.E., Cedar Rapids, Iowa, commencing at 9:01 a.m., and

19   reported by Patrice A. Murray, Certified Shorthand

20   Reporter, using machine shorthand.

21   Transcript Ordered:  12/27/24
     Transcript Completed:  1/3/25
22

23              Patrice A. Murray, CSR, RMR, FCRR
                        Court Reporter
24                      PO Box 10541
                   Cedar Rapids, Iowa 52410
25              PAMurrayReporting@gmail.com
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 1 of 62

1                              <u>**INDEX**</u>

2      <u>**WITNESS**</u>                                              <u>**PAGE**</u>

3       TANNER BOHLING
               DIRECT EXAMINATION - BY MR. EDWARDS          9
4              CROSS-EXAMINATION - BY MR. WASSMER           27
               REDIRECT EXAMINATION - BY MR. EDWARDS        29
5              RE-REDIRECT EXAMINATION - BY MR EDWARDS      31
        AUSTIN BAILEY
6              DIRECT EXAMINATION - BY MR. EDWARDS          33
               CROSS-EXAMINATION - BY MR. WASSMER           41
7              REDIRECT EXAMINATION - BY MR. EDWARDS        46

8                              * * * * *

9

10     <u>**EXHIBITS**</u>                                             <u>**PAGE**</u>

11      Exhibits 1 through 5                                  8

12                             * * * * *

13

14      Exhibits A through D                                  7

15                             * * * * *

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 2 of 62

```
 1        (The following proceedings were held in open court.)

 2             THE COURT:  The matter now before the Court is

 3   the United States of America versus Shane Robert

 4   McDowell, number 24-CR-70.  The United States is

 5   represented by Assistant United States Attorneys Dillan

 6   Edwards and Jared Manternach.  The defendant is here in

 7   person with his attorney, Webb Wassmer.  The matter comes

 8   on for a hearing on the defendant's motion to suppress.

 9        We were having some technical issues.  Patrice, were

10   you able to establish a Wi-Fi connection?

11             COURT REPORTER:  Yes, I was.

12             THE COURT:  Okay.  Then I'll have to -- before

13   we get started, I'll have to get that set up.

14        I did want to talk about a few things before we get

15   started.  Mr. Edwards, can you give us a preview of who

16   you intend to call this morning?

17             MR. EDWARDS:  Yes, Your Honor.  There's two

18   witnesses the government will certainly call:  Tanner

19   Bohling first; and then second would be Austin Bailey.

20   Depending on how the evidence comes in, the government

21   then is prepared to call Skylar Mullins, but that would

22   kind of be a judgment call.  The government noticed the

23   defense counsel last night that it will not be calling

24   Deputy Matt Jackson, as he has a conflict, unable to be

25   here, and the government decided it wasn't necessary.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 3 of 62

```
 1              THE COURT:  Okay.  And, Mr. Wassmer, do you

 2    have any additional evidence, other than the exhibits you

 3    plan to offer?

 4              MR. WASSMER:  Just the four exhibits that I

 5    previously filed.  I do not plan on calling any

 6    witnesses.

 7              THE COURT:  Okay.  It occurs to me, whenever we

 8    have a suppression hearing and there has been a warrant

 9    issued, to at least think about Franks.  And I don't

10    think either of the parties cited Franks here.  And I

11    think I understand why, but I do want to visit with you

12    both about that.

13         On the first argument the defendant has about the

14    validity of the search warrant for any vehicle in which

15    Mr. McDowell may be found, it was issued without probable

16    cause, that was the part -- it was issued with a warrant.

17    So I believe, even though there might be an interesting

18    issue about issuing a warrant for any vehicle he's found

19    in, that's still something that I decide based on the

20    four corners of the warrant.  We're not here to

21    cross-examine the truth of the averments in the

22    affidavit.

23         Do you agree with that position, generally,

24    Mr. Wassmer?

25              MR. WASSMER:  Yes.  I'm not contending that
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 4 of 62

1  there's any false statements in the warrant affidavit or

2  that the officer left out any material information.  The

3  argument is basically that, based on the four corners of

4  that affidavit, it's insufficient to establish probable

5  cause for the portion of the warrant for any vehicle in

6  which Mr. McDowell may be driving or riding.

7        THE COURT:  Okay.  So I imagine you disagree

8  with the conclusion, Mr. Edwards, but you agree with

9  the *Franks* analysis, is that we're not here to

10 cross-examine and get outside the four corners of the

11 warrant with respect to the validity of the warrant?

12        MR. EDWARDS:  Yes, Your Honor.  And it was

13 exactly that analysis that led the government to be

14 comfortable with not calling Matt Jackson today.

15        THE COURT:  Okay.  So for the rest of this, the

16 next -- I mean, the rest of this, I think we need at

17 least some evidence about the search warrant was limited

18 to items found in Cedar County.  We need at least a

19 record on where the items were found to get to what seems

20 to be a legal issue about the effect of executing the

21 warrant on property that was in Linn County.  And then

22 with respect to the government's, I guess, backstop

23 arguments here, even if the warrant's invalid, whether

24 there was standing or separate probable cause, those

25 things, I believe at least, we need some evidence on, and

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 5 of 62

1   that's why we need an evidentiary hearing.

2       Do you agree with that, Mr. Edwards?

3           MR. EDWARDS:  I do.  I do agree with that, kind

4   of with one nuance there.  And the government called

5   defense counsel about this last week to apprise defense

6   counsel of the government's argument.

7       But it's the government's position that the

8   defendant has the initial burden to prove standing and

9   has to come forth with some evidence to prove that he

10  even has the ability to challenge the traffic stop/the

11  search warrant.  And, obviously, it's the government's

12  position that he can't meet that.  But I think that

13  there's an additional evidentiary burden that the

14  defendant has to prove that he has standing.

15          THE COURT:  All right.  Mr. Wassmer, any

16  additional thoughts on sort of the framework for the

17  hearing today or the burdens?

18          MR. WASSMER:  No.  I think the evidence, as the

19  Court indicated, is probably largely based on the

20  arguments that the government's making in its resistance.

21          THE COURT:  All right.  Then let's get started.

22  We do have two hours reserved for our hearing this

23  morning.  And, Mr. Edwards, you can begin.

24          MR. EDWARDS:  Thank you, Your Honor.  I guess

25  I'd just -- to kind of dovetail off my former argument

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 6 of 62

1    that I just made, I guess it's the government's position

2    that, given that standing is at issue here, that it's the

3    defendant's initial burden to come forward.  And so, I

4    guess, in terms of who goes first, it would be the

5    defendant.  Now, certainly, if the Court disagrees with

6    that or would prefer the government to go first, the

7    government is certainly ready.

8              THE COURT:  Mr. Wassmer, do you have any

9    problem in going first with your standing arguments?

10             MR. WASSMER:  Well, all I'm doing for evidence

11   is offering the four exhibits, which I think establishes

12   standing.  I do have a response.  It's more of an

13   argument as opposed to evidence on that.

14             THE COURT:  So you are offering your four

15   exhibits at this point?

16             MR. WASSMER:  Yes.

17             THE COURT:  Okay.  Any objection?

18             MR. EDWARDS:  No, Your Honor.

19             THE COURT:  Okay.  Those are admitted.

20        (Whereupon, Exhibits A through D were received.)

21             THE COURT:  Are any of them under seal?

22             MR. WASSMER:  I believe they were all filed

23   under seal.

24             THE COURT:  And do you wish them to remain so

25   at this point?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 7 of 62

```
 1          MR. WASSMER:  That's up to the government.
 2   They're basically from the government's discovery file,
 3   which is why I filed them under seal.
 4          MR. EDWARDS:  The government -- I believe that
 5   that's appropriate, and the government certainly has no
 6   objection to them being offered under seal.
 7          THE COURT:  Okay.  So those are admitted under
 8   seal.  And whether he's met his burden to establish
 9   standing, at least he's made his argument -- or his
10   evidence, I should say, with respect to standing.
11      And do you have any evidence you wish to present
12   this morning, Mr. Edwards?
13          MR. EDWARDS:  Thanks, Judge.  Preliminarily,
14   the government moves Government's Exhibits 1 through 5
15   into evidence, under seal.
16          THE COURT:  Any objection?
17          MR. WASSMER:  No objection.
18          THE COURT:  Government's Exhibits 1 through 5
19   are admitted under seal.
20      (Whereupon, Exhibits 1 through 5 were received.)
21          MR. EDWARDS:  At this time, the United States
22   calls Investigator Tanner Bohling.
23          THE COURT:  Investigator, if you could come
24   forward, please.  Our witness stand will be to your left.
25   And before you take a seat, if you would please stop and
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 8 of 62

```
 1   raise your right hand.
 2                        TANNER BOHLING,
 3   called as a witness, being first duly sworn or affirmed,
 4   was examined and testified as follows:
 5             THE COURT:  Please be seated.  When you are
 6   comfortable, just please adjust the microphone.  And pull
 7   your chair up so we can be sure to hear and record you.
 8        Mr. Edwards.
 9             MR. EDWARDS:  Thank you.
10                        DIRECT EXAMINATION
11        BY MR. EDWARDS:
12   Q.   Sir, will you please state and spell your name for
13   the court reporter.
14   A.   Tanner Bohling, T-A-N-N-E-R B-O-H-L-I-N-G.
15   Q.   How are you currently employed, sir?
16   A.   I'm employed with the Muscatine County Sheriff's
17   Office.
18   Q.   Are you attached to any drug task force in the area?
19   A.   I'm with the Muscatine County Drug Task Force, yes.
20   Q.   How long have you been attached to the Muscatine
21   County Drug Task Force?
22   A.   It will be four years now.
23   Q.   And just generally, what are some of your duties as
24   part of that task force?
25   A.   We investigate the distribution/manufacturing of
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 9 of 62

1  narcotics around Muscatine County.

2  Q.   And were you acting in that capacity at the relevant

3  times in this investigation?

4  A.   Yes.

5  Q.   Now, part of this investigation included the use of

6  a confidential informant or confidential source, which

7  I'll refer to as "CS" throughout today.  Will you just

8  describe for the Court what was explained or kind of the

9  process that it took for the CS to be signed up as an

10  informant in this case?

11  A.   Yes.  So we have the initial interview with them,

12  discovering who they have purchased narcotics from in the

13  past, quantity, as well as the price that they purchased

14  the drugs for.  From that point on, we ask them if they

15  would be willing to conduct controlled transactions for

16  us.  Typically, they'll state yes.  We'll go over our

17  procedure.

18  Q.   Let me just pause you right there.  Making this more

19  fact-specific, did the CS in this case reach out to

20  Muscatine County Drug Task Force to set up a meeting?

21  A.   Yes.

22  Q.   And what was, essentially, the CS's motivation in

23  terms of working with law enforcement?

24  A.   She wished to get out of jail because she was

25  serving a mittimus at the time.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 10 of 62

1   Q.   And so you stated that kind of generally you have an

2   initial interview where they identify sources.  Did you

3   have that interview with the CS in this case?

4   A.   Yes.

5   Q.   And after that interview -- or during that

6   interview, you talked about describing the process of

7   utilizing a CS.  Will you describe, just generally, what

8   was said to the CS in this case about that?

9   A.   We go over a typical controlled transaction, what

10  occurs, what we do beforehand and after.  I ask them if

11  they would be willing to consent to vehicle searches

12  before and after every transaction that we do; if they

13  would consent to a body search, a strip search, of their

14  person before and after every transaction as well.  They

15  also complete a confidential source agreement stating,

16  initialling, and signaturing [sic] that they would wear a

17  body transmitter so that we could listen.  That's pretty

18  much what we go over.

19  Q.   And in this case, is it conveyed -- or was it

20  conveyed to the CS that the CS is essentially working on

21  behalf of law enforcement during the time that she's

22  being directed by law enforcement?

23  A.   Yes.  That's something that she initials and signs.

24  Q.   And kind of the general conveyance there is that law

25  enforcement is in control as to how this goes?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 11 of 62

1  A.    Yes.

2  Q.    So in this case, was the CS signed up as a

3  confidential source?

4  A.    Yes.

5  Q.    And through what agency?

6  A.    It would be through the State of Iowa.

7  Q.    Through the Department of Narcotics?

8  A.    Yes.

9  Q.    And let's just continue on the story.  You have the

10  initial meeting.  Then the CS was signed up and explained

11  the procedures.  At some point, does law enforcement

12  utilize the CS to conduct a controlled purchase from the

13  defendant?

14  A.    Yes.

15  Q.    Was that on February 5, 2024, being the first one?

16  A.    Yes.

17  Q.    Will you describe, on February 5, 2024, the

18  procedures that law enforcement took throughout the

19  controlled purchase?

20  A.    So we have the CS set up the date and time of the

21  transaction on the 5th.  We all meet at a predetermined

22  meet location.  I go ahead and I brief all the detectives

23  and personnel that are going to be involved on the, I

24  guess, scenario and procedure that we're going to take

25  for the transaction.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 12 of 62

1    Once they're briefed and they don't have any
2  comments or concerns or questions, I will go back with
3  the CS, and that's when I begin my search of their
4  person, as well as having a couple of the other
5  detectives search their vehicle to kind of speed up the
6  process.  And we just kind of go over some of the fine
7  details, give them the money, those sort of things.
8  Q.    Now, in this case, page 1 of -- page 2 of
9  Government's Exhibit 1, which is a report from the
10  February 5th transaction, it describes a Detective Nicole
11  Sink conducting the -- essentially, the strip search.  Is
12  that because the CS in this case was a female?
13  A.    Yes.
14  Q.    And so -- I think you said earlier that you
15  conducted the search of the person.  That would have been
16  a female law enforcement officer?
17  A.    Yeah, a female officer.  Gender-specific on who we
18  search.
19  Q.    And then you stated that deputies searched the CS's
20  vehicle in this case before the transaction?
21  A.    Before the transaction, before we left.
22  Q.    And was both the person search and the vehicle
23  search negative for any contraband?
24  A.    They were both negative.
25  Q.    The report gets into kind of the details as to what

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 13 of 62

1  specifically occurred in terms of where the controlled
2  source -- or the controlled purchase occurred, but let's
3  pick up after the controlled purchase from the defendant.
4  What happened with the CS as soon as she -- kind of
5  starting with the CS obtaining the methamphetamine from
6  the defendant.
7  A.    Once they received the methamphetamine, I reach out
8  to them via text or phone call.  I explain to them to,
9  basically, go around the block and meet me at a
10  destination where it would be out of sight, kind of out
11  of mind, from other eyes and ears so that we can take
12  possession of the methamphetamine from them, as well as
13  get the CS searched, as well as their vehicle, and have
14  them complete a statement.
15  Q.    And so on February 5th, the CS's vehicle and person
16  were searched both before and after the controlled
17  purchase?
18  A.    Correct, before and after.
19  Q.    And the CS knew going into it that that was going to
20  happen?
21  A.    Yes.
22  Q.    And throughout the entirety of the controlled
23  purchase, the CS was -- essentially, consented to law
24  enforcement listening in live via the body wire?
25  A.    Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 14 of 62

1  Q.    Was the next controlled purchase that the same CS

2  did from the defendant on February 13, 2024?

3  A.    Yes.

4  Q.    Were the same procedures in place in terms of the

5  searching before and after both the vehicle and the

6  person?

7  A.    Yes.

8  Q.    And did the CS again consent to wearing the body

9  wire so law enforcement could listen live into the

10  conversations the CS was having with the defendant?

11  A.    Yes.

12  Q.    Now I want to get to, essentially, the date in

13  question here, February 28, 2024.  Did law enforcement

14  work with the CS to arrange another controlled purchase

15  from the defendant?

16  A.    Yes.

17  Q.    Earlier in the day on February 28th, was there an

18  attempt that was unsuccessful to conduct the controlled

19  purchase?

20  A.    Yes.

21  Q.    Will you describe that.

22  A.    So once we did the brief and our searches and we

23  departed the area to begin our en route to Cedar Rapids,

24  the target actually reached out and stated that he would

25  no longer have the methamphetamine on hand and that we

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 15 of 62

1  would have to wait a few hours, and so it would be best

2  for us to try again later.

3  Q.   When you say "target," is that the defendant?

4  A.   That would be the other defendant, I guess.

5  Q.   Okay.  So the defendant's source?

6  A.   The source, yes.

7  Q.   The source conveyed to the defendant, who then

8  conveyed to the CS, that you have to wait a couple hours?

9  A.   Correct.

10 Q.   Thank you.  So during that time -- and it may have

11 been before the attempt or the successful one -- but did

12 law enforcement obtain a search warrant related to the

13 defendant?

14 A.   Yes.

15 Q.   And did -- was that in hand before what I'm going to

16 term as the "controlled purchase" in this case that

17 occurred in the evening of February 28th?

18 A.   Yes, it was.

19 Q.   And when the warrant was in hand, did you have

20 knowledge as to where the defendant and a vehicle -- the

21 specific vehicles associated with him were located, in

22 what county?

23 A.   Yes.

24 Q.   And what county was that?

25 A.   Cedar County.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 16 of 62

1    Q.    And then before the actual controlled purchase in

2    the evening of February 28th, was there a safety briefing

3    in Cedar County?

4    A.    Yes.

5    Q.    And who led that safety briefing?

6    A.    I did.

7    Q.    And, just generally, what is -- what was covered in

8    that safety briefing?

9    A.    It was determined that we were going to take off the

10   target on a traffic stop before they got back to Cedar

11   County, back home.

12   Q.    The target in this instance being the defendant?

13   A.    Yes.

14   Q.    So there was kind of -- the operation was explained

15   to the people in Cedar County that were assisting that

16   the controlled buy was going to happen, and on their way

17   back to Cedar County, a traffic stop was going to occur

18   to effectuate the controlled purchase?

19   A.    Yes.

20   Q.    Now, was there a similar safety briefing that

21   another investigator held with the investigators and

22   officers assisting in Cedar Rapids?

23   A.    Yes.

24   Q.    And would that have been a similar explanation in

25   terms of what occurred during that safety briefing?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 17 of 62

1  A.   Yes.

2  Q.   Now, I think it's common knowledge that officers

3  have kind of radio frequencies to talk with themselves

4  and be able to talk with dispatch; is that right?

5  A.   Yes.

6  Q.   During controlled purchases, do you and other

7  detectives and officers assisting have kind of a separate

8  communication system?

9  A.   Yes.

10  Q.   Will you describe that for the Court, please.

11  A.   So apart from our radio system, we also have a --

12  WhatsApp, which is just a text message group message of

13  all of our officers/investigators within that to

14  time-stamp certain situations or events that are

15  occurring at the time of the controlled transaction.

16  Q.   Do you also utilize walkie-talkies?

17  A.   Yes.

18  Q.   Will you describe that.

19  A.   We refer to them as our radios.  We are constantly

20  communicating which direction they're traveling, when

21  they're making the turn, if they're stopped at red

22  lights, where they're positioned during the controlled

23  transaction, what they're close to.  That way, everybody

24  has an understanding of where they're at at all times.

25  Q.   And so this would just be a narrating live to

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 18 of 62

1  everybody involved as to what a specific officer is

2  seeing at specific times?

3  A.    Yes.

4  Q.    And are those -- they're your radios, but are they

5  kind of a closed frequency, meaning that everyone that is

6  involved in the controlled purchase is talking over the

7  same frequency, and other officers that aren't involved

8  wouldn't be listening in?

9  A.    Correct.  It was on a different channel.

10  Q.    So after the safety briefings were had, was -- at

11  least in Cedar County, did yourself meet with the

12  confidential source?

13  A.    Yes.

14  Q.    And while you may not have done the searches

15  yourself, but was the -- was the CS's person and vehicle

16  searched?

17  A.    Yes.

18  Q.    Did the CS know the plan in terms of the traffic

19  stop?

20  A.    No.

21  Q.    And so will you just describe for the Court

22  generally what happened next.  After the CS's vehicle and

23  person were searched and the safety briefings were had,

24  what happened?

25  A.    That is when we departed the area to travel to go

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 19 of 62

1  pick up the defendant.

2  Q.   Now, at some point during this controlled purchase,

3  either before or during, did you instruct the CS to do

4  something with the methamphetamine he or she received

5  from the defendant after receiving it?

6  A.   Yes.

7  Q.   Will you describe that for the Court.

8  A.   I instructed the CS to place it in the rear,

9  underneath the spare tire compartment.  That way we knew

10 exactly where it would be.

11 Q.   And was that in your initial meeting with the CS

12 before the controlled purchase occurred?

13 A.   No, not in the initial meeting.  This was over a

14 text before the transaction.

15 Q.   So, essentially, while she is acting as a

16 confidential source and with the defendant, you sent her

17 a text telling her what to do with the methamphetamine?

18 A.   Yes.

19 Q.   So the report, which is Exhibit 3, describes --

20 sorry.  Government's Exhibit 4 is a more detailed report.

21 The first four pages of it describes the CS and the

22 defendant traveling to Cedar Rapids, at which point the

23 defendant met with his source of supply, later identified

24 as Andre McNairy.  Did law enforcement conducting

25 physical surveillance observe that?

Contact Patrice Murray at PAMurrayReporting@gmail.com
for a complete copy of the transcript.
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 20 of 62

```
 1   A.    Yes.
 2   Q.    Was that something that would be radioed over the --
 3   or discussed over the radio frequency?
 4   A.    Yes.
 5   Q.    After the defendant met with his source of supply,
 6   what happened next in terms of what law enforcement saw?
 7   A.    We saw Mr. McNairy exit his vehicle and go into the
 8   Dollar Tree or the store.  Then our CS, as well as the
 9   defendant here, drove around to where they were
10   originally parked at the car wash.
11   Q.    And after they were parked at the car wash, what
12   happened?
13   A.    That is when I believe the CS moved the
14   methamphetamine to the rear of the vehicle.
15   Q.    Was that observed personally by you?
16   A.    Not personally, no.
17   Q.    But was that conveyed over, an officer that did view
18   it, over the radio frequency?
19   A.    Yes.
20   Q.    And also, as well, over the text message or the
21   WhatsApp thread?
22   A.    Yes.
23   Q.    Now, was the CS equipped with a body wire in this --
24   during this controlled buy?
25   A.    Yes.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 21 of 62

1  Q.   Did that allow investigators, including yourself, to

2  listen live during the entire transaction?

3  A.   Yes.

4  Q.   Was there anything specific that you can recall that

5  would lead you to believe that the defendant obtained

6  methamphetamine from his source of supply?

7  A.   Yes.  The fact that they were, I believe, counting

8  money, and then stating that they were good and said

9  "Let's roll," stating that they had received it and we

10 can go back to Cedar County, go home, essentially.

11 Q.   And after the defendant met with his source, got

12 back in the CS's vehicle, did the defendant make a

13 statement in terms of why it wasn't a full pound of

14 methamphetamine?

15 A.   Yes.  The defendant stated that he wanted to keep an

16 ounce for himself.

17 Q.   Referring to the source, the source kept an ounce?

18 A.   Correct, yes, referring to the source.

19 Q.   And it would have been after that time, the CS got

20 out of the vehicle and placed the methamphetamine in the

21 tire well in the trunk?

22 A.   Yes.

23 Q.   Just as you had directed her?

24 A.   Yes.

25 Q.   From there, what actions were taken by law

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 22 of 62

1　enforcement?  After the methamphetamine was placed in the

2　trunk, what happened next?

3　A.　We continued our surveillance and observed them to

4　travel back onto the highway to travel back home.

5　Q.　At some point -- it may not have been yourself, but

6　you were listening live to the radio frequency -- were

7　Cedar Rapids police officers that had been briefed on

8　this plan directed to conduct a traffic stop of the CS's

9　vehicle?

10　A.　Yes.

11　Q.　And how long after the traffic stop was initiated

12　until you arrived on scene?

13　A.　I believe it was two or three minutes is all.

14　Q.　And what was your responsibility when you arrived on

15　scene?

16　A.　My responsibility was to stay with the CS and calm

17　them down and just get them under control.

18　Q.　And after the controlled purchase or after the

19　defendant was taken away, was the CS's vehicle -- or

20　sorry.  During the traffic stop, was the CS's vehicle

21　searched?

22　A.　Yes.

23　Q.　And was the methamphetamine recovered from the rear

24　tire well?

25　A.　Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 23 of 62

1   Q.   After the traffic stop was essentially concluded,

2   did you have the CS write a statement as to what

3   happened?

4   A.   Yes, right after the search of her person by an

5   officer.

6   Q.   Now, on the February 5th controlled purchase and the

7   February 28th controlled purchase, was there also a GPS

8   tracker affixed to the CS's vehicle?

9   A.   Yes.

10  Q.   Now, this next line of questioning may be obvious,

11  but I want to ask it.   Was it the defendant's vehicle

12  that was stopped on February 28th?

13  A.   No.

14  Q.   Do you have any information that defendant was the

15  owner of that vehicle?

16  A.   No.

17  Q.   Did you have any information that the defendant had

18  permission to ever drive that vehicle?

19  A.   No.

20  Q.   Was the vehicle the CS's vehicle?

21  A.   Yes.

22  Q.   And at all points, was the CS the driver of that

23  vehicle?

24  A.   Yes.

25  Q.   Now, this last line of questioning I have just is

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 24 of 62

1  kind of generally your experience with search warrants.

2  You said that you're with Muscatine County, but on the

3  drug task force.  Does your work with the drug task force

4  take you oftentimes outside of Muscatine County?

5  A.    Yes, many times.

6  Q.    Are there times where you will obtain a Muscatine

7  County search warrant to search a place or a person or a

8  thing outside of Muscatine County?

9  A.    Yes.

10  Q.    And is that permitted under Iowa state law?

11  A.    Yes.

12  Q.    Now, finally, here, kind of this is more of a

13  hypothetical question -- actually, it's not.  It's a

14  factual question.  After the controlled buy happened on

15  February 28th, the CS and the defendant were heading back

16  to Cedar County.  If you didn't have the search warrant,

17  if the search warrant hadn't been signed, do you think

18  that you had probable cause to conduct a traffic stop and

19  search that vehicle?

20  A.    Yes.

21  Q.    Will you just articulate some of the reasons why you

22  would have had probable cause.

23  A.    Just from what all of our officers and investigators

24  witnessed:  Them meeting with an unknown individual, the

25  defendant here getting out of the vehicle for a short

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 25 of 62

1 amount of time, less than a few minutes, and then

2 reentering their vehicle and departing the area.

3 Q.    And did you know exactly where the methamphetamine

4 was inside the car?

5 A.    Yes.  At that time, we did.

6 Q.    Now, similarly, during the three controlled buys

7 that we discussed -- February 5th, February 13th,

8 February 28th -- kind of outside of the first explanation

9 as to the procedures, when you are conducting a search of

10 the CS's person and the CS's vehicle, do you explicitly

11 ask the CS every time, "Do I have your consent to do

12 this?  Do I have your consent to do this?"

13 A.    Not before every transaction.  That's covered, I

14 guess, on our initial.

15 Q.    So the initial meeting with the confidential source

16 that would lead, then, to the controlled purchases, kind

17 of this general consent is covered?

18 A.    Yes.

19 Q.    So during the specific controlled purchases, there

20 isn't an explicit conversation each time about the CS's

21 consent to every search?

22 A.    No, not specifically, no.

23         MR. EDWARDS:  No further questions for this

24 witness, Your Honor.

25         THE COURT:  Thank you, Mr. Edwards.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 26 of 62

```
 1        Mr. Wassmer.
 2             MR. WASSMER:  Thank you, Your Honor.
 3                    CROSS-EXAMINATION
 4        BY MR. WASSMER:
 5   Q.   I first want to ask you about the search warrant
 6   that was issued on February 28th of 2024.  Now, you were
 7   not the officer who obtained that warrant, correct?
 8   A.   Correct.
 9   Q.   But that warrant was obtained, I believe it was, by
10   Matt Jackson, right?
11   A.   Yes.
12   Q.   And that was obtained prior to the CS meeting with
13   Shane McDowell later that day, right?
14   A.   No, they were together when that warrant was signed.
15   Q.   Okay.  Is there anything at all in the warrant
16   affidavit about the February 28, 2024, controlled
17   purchase?
18   A.   No.
19   Q.   And the search warrant does not contain any
20   information about the vehicle the CS was driving, the
21   2010 Mercedes-Benz SUV, correct?
22   A.   I do not know about that.
23   Q.   Okay.  But that would be something that either is or
24   isn't in the search warrant, in the application?
25   A.   Yes.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 27 of 62

1  Q.   Now, you talked about the CI's vehicle being

2  searched after the February 5th and the February 13th

3  controlled buys.  And that was searched by an officer,

4  either you or somebody at your direction?

5  A.   At a minimum two officers, yes.

6  Q.   Okay.  And when in the process did those vehicle

7  searches occur?

8  A.   Within five minutes of each transaction.

9  Q.   Okay.  And is it after the transaction is concluded

10  and any suspects or sources of methamphetamine have left

11  the area?

12  A.   Yes.

13  Q.   And is it one of the last steps that's taken in the

14  controlled buy before the CS is released?

15  A.   Yes.

16  Q.   Now, you mentioned that part of your purpose in

17  coming to the traffic stop was to calm down the CS,

18  right?

19  A.   Yes.

20  Q.   And you -- so that would indicate that the CS was

21  upset?

22  A.   No.  She was in shock, because we did not tell them

23  that we were going to conduct the traffic stop.

24  Q.   Okay.  So you had not warned the CS about a traffic

25  stop?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 28 of 62

1  A.  No.  We like the surprise factor.

2  Q.  Okay.  And was one of the reasons the CS was in

3  shock was because she didn't have a driver's license?

4  A.  I'm unaware of her feelings for that.

5  Q.  Okay.  Did she have a driver's license?

6  A.  You're testing my memory here.  I'm unsure.

7  Q.  Okay.  Well, you had mentioned when you first met

8  with her she had been in jail; is that right?

9  A.  Yes.

10  Q.  And that was for a conviction for driving with a

11  suspended license, wasn't it?

12  A.  I'm unsure.

13  Q.  And you also indicated that the vehicle was owned by

14  her.  It was actually owned by her boyfriend, wasn't it?

15  A.  I do not know, the vehicle that was registered.  I

16  just knew she was driving it.

17         MR. WASSMER:  Okay.  Nothing further, Your

18  Honor.

19         THE COURT:  Thank you, Mr. Wassmer.

20     Any redirect?

21                REDIRECT EXAMINATION

22     BY MR. EDWARDS:

23  Q.  Just one point of clarification, sir.  When you

24  mentioned that the warrant was obtained when the

25  defendant and CS were together, was that during the first

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 29 of 62

```
 1  kind of unsuccessful controlled purchase earlier in the
 2  day on February 28th?
 3  A.   Yes, approximately 2:48 p.m.
 4           MR. EDWARDS:  No further questions, Your Honor.
 5           THE COURT:  All right.  Thank you, Mr. Edwards.
 6      Any recross?
 7           MR. WASSMER:  No, Your Honor.
 8           THE COURT:  Sir, I take it the routine in these
 9  circumstances would be to have dropped off the defendant
10  and then searched the car later; is that true?
11           THE WITNESS:  Yes.
12           THE COURT:  Okay.  Why did you do something
13  different?
14           THE WITNESS:  In which circumstance, which
15  date?
16           THE COURT:  I'm sorry.  The February 28th
17  search where you decided to surprise-stop the driver and
18  do the search in Linn County.  Why did you make that
19  decision?
20           THE WITNESS:  We believed -- well, we were an
21  unknown from the other target, his source.  We didn't
22  know who that was.  So we believed if we traffic stopped
23  that individual, it would be a clear shot of giving up
24  our CS, and we weren't -- we didn't want to do that.
25           THE COURT:  Okay.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 30 of 62

1    THE WITNESS:  So we determined to stop both of

2  them, essentially.

3    THE COURT:  Okay.  That's all I have for you.

4  Let's find out if that prompted anything from the

5  lawyers.

6    Anything else, Mr. Edwards?

7    MR. EDWARDS:  Just one point of clarification.

8    RE-REDIRECT EXAMINATION

9  BY MR EDWARDS:

10  Q.    When the defendant met with his source on

11  February 28th -- I believe it was in the parking lot of a

12  store -- did law enforcement at that time know the

13  identity of the defendant's source?

14  A.    I'm not sure of that.  That would be the

15  Cedar Rapids Police Department, what they knew.

16  Q.    Okay.  After the controlled purchase occurred, did

17  law enforcement conduct a controlled purchase on the

18  defendant's source -- or, I'm sorry -- a traffic stop on

19  the defendant's source's vehicle?

20  A.    Yes.

21  Q.    And through that, learned the defendant's source's

22  identity?

23  A.    Yes.

24  Q.    Was it law enforcement's fear that, once they

25  conducted that traffic stop, the defendant could be

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 31 of 62

```
 1   tipped off that the source was traffic stopped?
 2   A.   Yes.   That's what I was trying to say.
 3   Q.   And so is that what resulted in the decision to do
 4   simultaneous traffic stops on the source and on the
 5   defendant -- or on the CS's vehicle?
 6   A.   Yes.
 7           MR. EDWARDS:  Okay.  No further questions.
 8           THE COURT:  All right.  Thank you, Mr. Edwards.
 9       Any additional cross-examination based on that,
10   Mr. Wassmer?
11       (Whereupon, Mr. Wassmer conferred with the
12   defendant.)
13           MR. WASSMER:  No further questions, Your Honor.
14           THE COURT:  All right.  Thank you, sir.  You
15   may be excused.
16           THE WITNESS:  Thank you.
17           THE COURT:  Mr. Edwards, you have another
18   witness.
19           MR. EDWARDS:  Yes, Your Honor.  The government
20   calls Austin Bailey.
21           THE COURT:  Sir, if you could come forward,
22   please.  And before you take a seat -- in the box here to
23   your left.  Before you take a seat, if you would stop and
24   raise your right hand.
25
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 32 of 62

1          AUSTIN BAILEY,

2   called as a witness, being first duly sworn or affirmed,

3   was examined and testified as follows:

4          THE COURT:  Please be seated.  And when you are

5   comfortable, I'd ask you to adjust the microphone, if you

6   need to, and pull up your chair.  We want to be sure to

7   hear and record you.

8       Mr. Edwards.

9          MR. EDWARDS:  Thank you.

10                     DIRECT EXAMINATION

11      BY MR. EDWARDS:

12  Q.   Sir, could you please state and spell your name for

13  the court reporter.

14  A.   My first name is Austin, A-U-S-T-I-N; last name is

15  Bailey, B-A-I-L-E-Y.

16  Q.   How are you currently employed?

17  A.   I'm a police officer.

18  Q.   With what department?

19  A.   The Cedar Rapids Police Department.

20  Q.   How long have you been with the Cedar Rapids Police

21  Department?

22  A.   Four years.

23  Q.   And back in February of 2024 -- so February of this

24  year -- what was your role within Cedar Rapids Police

25  Department?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 33 of 62

```
1   A.    I was a member of the Police Community Action Team.
2   Q.    Generally, what are the duties of kind of the PCAT
3   Unit, or the Police Community Action Team?
4   A.    Proactive police work, with an emphasis in reducing
5   gun crime.
6             COURT REPORTER:  I'm sorry.  Would you say that
7   again, please.
8             THE WITNESS:  Proactive police work.
9         BY MR. EDWARDS:
10  Q.    With an emphasis in?
11  A.    In reducing gun violence within the city.
12  Q.    Through that role -- are you still in that role?
13  A.    No.
14  Q.    What is your position now?
15  A.    Patrol officer.
16  Q.    Going back to February of '24, when you were in the
17  PCAT role, was it common for you to assist investigators
18  in the drug unit with controlled purchases or other
19  things they may need help with?
20  A.    Yes.
21  Q.    Is that still kind of a part of a role of a patrol
22  officer?
23  A.    It can be.
24  Q.    If they need a marked unit to do something?
25  A.    Yes.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 34 of 62

1  Q.   Now, going back to February 28th of 2024, were you a

2  part of a team that was investigating the defendant,

3  Shane McDowell?

4  A.   Yes.

5  Q.   And as part of that investigation, did you attend a

6  safety briefing here in Cedar Rapids with regard to what

7  was going to occur on that date?

8  A.   I did.

9  Q.   What was covered during that safety briefing?

10  A.   Myself, along with my partner, met with Cedar County

11  investigators.  They briefed us on their investigation

12  involving Mr. McDowell.  They had provided my partner and

13  I a search warrant that they had authored and gotten

14  signed for a search of Shane and any vehicle that he was

15  to be associated in -- or found in.

16  Q.   Did -- during that initial safety briefing, were you

17  apprised as to the specific actions that investigators

18  were going to take during the controlled purchase?

19  A.   Yes.

20  Q.   What were -- what was -- what were you briefed into?

21  A.   A controlled buy.  Essentially, he was supposed to

22  be in town meeting with another gentleman to purchase

23  drugs.

24  Q.   And was it a part of that safety briefing that one

25  of your responsibilities coming out of that was to be

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 35 of 62

1  conducting a traffic stop after the controlled purchase?
2  A.    Correct.
3  Q.    Were you apprised as to whether or not the
4  defendant -- during the safety briefing -- would be
5  arriving in his vehicle or somebody else's vehicle?
6  A.    They had provided, if I remember correctly, it was
7  several vehicles that he was associated with prior to us
8  going out there.
9  Q.    Were you apprised during the safety briefing that
10  the defendant would be in a CS's vehicle?
11  A.    Yes.
12  Q.    And were you given the description of the CS's
13  vehicle?
14  A.    We were.
15  Q.    And what was just the general description?
16  A.    It was a black, I think, Mercedes SUV.
17  Q.    Now, during the safety briefing, were you also
18  provided any equipment related to the investigation?
19  A.    Yes.
20  Q.    Will you describe that for the Court, please.
21  A.    My partner and I were provided a walkie-talkie.  We
22  could overhear and communicate with the Cedar County
23  investigators.
24  Q.    Now, going forward through the controlled purchase
25  occurring, what was being discussed over the

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 36 of 62

1  walkie-talkies, or what are you listening to?

2  A.    My partner and I over the walkie-talkie just

3  monitored Cedar County's radio traffic as it related to

4  their surveillance of Shane and his activities.

5  Q.    Before the controlled -- or before the traffic stop

6  occurred, what did you learn or what did you have

7  knowledge of in terms of what was being discussed over

8  the walkie-talkies?

9  A.    A drug deal in the parking lot of Walmart.

10  Q.    And did that involve the defendant?

11  A.    Yes.

12  Q.    The defendant met with a source of supply?

13  A.    Yes.

14  Q.    And then what did you know had happened through the

15  radio traffic in terms of what happened after the

16  defendant met with his source?

17  A.    After we -- the defendant met with the source, we

18  overheard that he was leaving with the CI.  They had

19  stopped briefly.  The defendant opened the trunk of the

20  CI's vehicle, placed what we imagine were the drugs in

21  the back, and then got back in and left.

22  Q.    And so at the time you are conducting the traffic

23  stop, you knew that a drug deal had occurred and where

24  specifically in the car the drugs were?

25  A.    Correct.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 37 of 62

1  Q.   Now, kind of going back, while you are listening to

2  this traffic stop [sic], what is essentially your role

3  while this controlled purchase is going on?

4  A.   My partner and I were parked a distance away and

5  just -- our role was to monitor radio traffic.  Once the

6  deal was done, it was our role to conduct a traffic stop

7  on the car.

8  Q.   And after the deal was done, you knew the type of

9  vehicle that you were looking for?

10  A.   Correct.

11  Q.   And were you being directed as to the exact location

12  of that vehicle by other investigators?

13  A.   Yes.

14  Q.   And did someone working with the Cedar County

15  investigators direct you to conduct the traffic stop?

16  A.   Yes.

17  Q.   After the traffic stop was initiated, what happened

18  next in terms of what did -- what did you do during the

19  traffic stop?

20  A.   I had approached the driver's side.  I met with the

21  CI.  She had provided me a brief story about where she

22  was coming from and going.  I had asked her to step from

23  the vehicle.  She stood in front of my car while I waited

24  for Cedar County investigators to arrive on the stop.

25  Q.   And did they arrive fairly quickly after the stop

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 38 of 62

1  occurred?

2  A.    Yeah, a minute or two.

3  Q.    During your conversation with the CS, was there any

4  conversation about the CS's driver's license?

5  A.    Yes.

6  Q.    Will you describe that.

7  A.    She had stated she was barred, a barred driver.

8  Q.    Did she provide -- or did the CS provide you with a

9  driver's license?

10  A.    If -- I don't recall if she gave me an ID or not,

11  but she had given me her name.

12  Q.    During the entire interaction with the driver of

13  this vehicle, did you know that person to be the CS

14  involved in this case?

15  A.    Yes.

16  Q.    After Cedar County investigators arrived, what did

17  you do next relevant to this investigation?

18  A.    My partner was speaking with Mr. McDowell at the

19  window.  Once Cedar County had arrived, they remained

20  with the CI.  I approached the passenger's side.  My

21  partner, he requested the defendant step out.  He was

22  detained in handcuffs at that point.

23  Q.    And then what did you do next after that?

24  A.    Completed a search of his person, escorted him to

25  the front of our patrol vehicle, and I explained to him

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 39 of 62

1  that there was a search warrant involving -- for him,

2  including any vehicle he was found to be inside.

3  Q.    And at that point, did you search the vehicle?

4  A.    I did.

5  Q.    And what -- as relevant here, what did you find?

6  A.    A large package of methamphetamine.

7  Q.    And where was it located?

8  A.    In the trunk.

9  Q.    Was there a specific area of the trunk it was

10 located?

11 A.    The spare -- the spare tire area of the trunk.

12 Q.    Now, you wrote in your report that you conducted the

13 stop and the search of the vehicle based on the search

14 warrant.  Do you remember that?

15 A.    Yes.

16 Q.    Did you have a copy of the search warrant in hand

17 when you -- before you conducted the traffic stop?

18 A.    They provided us at our safety briefing a copy of

19 the warrant, yeah.

20 Q.    Now, say you didn't have a warrant.  Do you think

21 you had probable cause to stop and search the vehicle?

22 A.    Yes.

23 Q.    And will you articulate for the Court on -- why you

24 believed you had probable cause.

25 A.    Based on other officers' surveillance of watching a

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 40 of 62

1 drug deal go down, and overhearing it with the CI.

2 Q.   And you knew specifically exactly where within the

3 car you would find the methamphetamine?

4 A.   Right.

5        MR. EDWARDS:  No further questions for this

6 witness, Your Honor.

7        THE COURT:  Thank you, Mr. Edwards.

8     Mr. Wassmer.

9        MR. WASSMER:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11     BY MR. WASSMER:

12 Q.   Officer, prior to this traffic stop, had you ever

13 met the driver of the vehicle?

14 A.   No, sir.

15 Q.   Had you ever met Shane McDowell prior to the traffic

16 stop?

17 A.   No, sir.

18 Q.   Now, you did have a copy of the search warrant that

19 was provided to you in advance of the traffic stop,

20 right?

21 A.   Yes, sir.

22 Q.   And did you read through that search warrant before

23 it was executed?

24 A.   No, I didn't.  I didn't read the details of it.

25 Q.   Did your partner read through it?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 41 of 62

1    A.    I don't recall.

2    Q.    Do you normally execute search warrants without

3    reading what's in them?

4    A.    I've never executed a search warrant authored by

5    another agency.

6    Q.    Okay.  So this was the first time you've executed

7    any search warrant or just one authored by -- or obtained

8    by a different agency?

9    A.    Just obtained by a different agency.

10   Q.    Have you executed search warrants that you had

11   obtained?

12   A.    Yes.

13   Q.    And on about how many occasions prior to this

14   traffic stop?

15   A.    A dozen, for a rough number.

16   Q.    Are you aware that search warrants can be limited in

17   various ways by the issuing court?

18   A.    I'm not.

19   Q.    Okay.  Well, is a search warrant generally limited

20   as to the place or the person to be searched?

21   A.    Yes.

22   Q.    Are they generally limited as to the items to be

23   searched for?

24   A.    Correct.

25   Q.    So, for example, it can say you're looking for guns,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 42 of 62

```
 1   you're looking for stolen property, you're looking for
 2   narcotics, right?
 3   A.   Yes, sir.
 4   Q.   Are they sometimes limited as to when they can be
 5   executed, such as they have to be executed been 8:00 a.m.
 6   and 8:00 p.m. or some other specific time frame?
 7   A.   Yes.
 8   Q.   And are they limited as to where they can be
 9   executed?
10   A.   As far as the -- yes.
11   Q.   Because normally a search warrant is going to be,
12   for example, for a piece of property, a residential
13   address, or some kind of building, right?
14   A.   Or a person.
15   Q.   Or a person.
16   A.   Sure.
17   Q.   Okay.  But if it's a residential property or some
18   other building, those are fixed in location, generally,
19   right?
20   A.   Yes.
21   Q.   Okay.  Do you think it's important to read and
22   understand the terms and limits of a search warrant
23   before you execute it?
24   A.   Yes.
25   Q.   But I think you indicated you had not read this
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 43 of 62

1  search warrant, correct?

2  A.    Correct.

3  Q.    What information about the search warrant did you

4  receive from the Cedar County officers?

5  A.    We had just received a brief synopsis of their

6  investigation into the defendant.  They had provided us,

7  like I said, with the warrant and stated that there was

8  likely to be some kind of buy happening.

9  Q.    Okay.  Were you specifically informed that it

10 included the person of Shane McDowell?

11 A.    Yes.

12 Q.    Were you specifically informed that it included the

13 vehicle that the -- that the CS was driving?

14 A.    I was.

15 Q.    Okay.  And was it your understanding that the

16 vehicle was specifically identified in the search

17 warrant; for example, it was a black Mercedes SUV,

18 license plate number such and such?

19 A.    Yeah.  If I remember right -- this is months ago,

20 but it -- the verbiage was any vehicle that Shane --

21 sorry -- the defendant was found to be in.

22 Q.    Okay.  So you had been told that it was any vehicle

23 that he was either driving or a passenger in?

24 A.    Yes, sir.

25 Q.    Okay.  Did you have any information that the search

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 44 of 62

1  warrant included the specific vehicle that you were

2  stopping?

3  A.    No, sir.

4  Q.    Now, this traffic stop and the execution of the

5  search warrant occurred in Linn County, Iowa, correct?

6  A.    Yes, sir.

7  Q.    And you did a report regarding the traffic stop,

8  correct?

9  A.    Yes, sir.

10 Q.    And in that report, you gave the reason as the

11 traffic stop was for the purpose of executing the search

12 warrant, correct?

13 A.    Correct.

14 Q.    And there is no mention in that report of any

15 controlled buy or drug transaction or belief that there

16 might be drugs in the vehicle, correct?

17 A.    Correct.

18 Q.    There were also no traffic violations that were

19 observed that this vehicle was committing prior to

20 stopping the vehicle, correct?

21 A.    Correct.

22 Q.    When you -- and you mentioned that the driver had a

23 barred license?

24 A.    She did.

25 Q.    Okay.  Did you know that prior to the traffic stop?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 45 of 62

1   A.    I don't recall.

2   Q.    Okay.  Was the driver allowed to drive away from the

3   traffic stop?

4   A.    I don't know.

5         MR. WASSMER:  Okay.  Nothing further, Your

6   Honor.

7         THE COURT:  Thank you, Mr. Wassmer.

8       Mr. Edwards?

9                   REDIRECT EXAMINATION

10      BY MR. EDWARDS:

11  Q.    Sir, in terms of report writing, is there a

12  technique in terms of report writing to try, if possible,

13  to essentially wall off a cooperator's involvement in a

14  case?

15  A.    Yes.

16  Q.    And so if you have a search warrant and you're

17  executing a search warrant, that's kind of a way of

18  walling off the controlled purchase, in terms of --

19  instead of putting everything in the report, in terms of

20  the controlled purchase, who the CS was, and everything

21  that had occurred?

22  A.    Yes.  It wasn't -- it was an out-of-town

23  investigation, so I wasn't going to include their

24  observations, surveilling him, and anything that went

25  into it prior to the stop.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR   Document 43   Filed 01/03/25   Page 46 of 62

1  Q.   And at the time you executed the search warrant, did

2  you believe you had a valid search warrant?

3  A.   Yes.

4  Q.   And did you believe, as you were executing the

5  traffic stop and the search, that you were doing that

6  pursuant to the search warrant?

7  A.   Yes.

8           MR. EDWARDS:  No further questions, Your Honor.

9           THE COURT:  Thank you, Mr. Edwards.

10      Mr. Wassmer?

11           MR. WASSMER:  Nothing further.

12           THE COURT:  Officer, just a few questions.  I

13  understand in your report you indicate that the reason

14  you made the stop was because of the search warrant.

15  It's your belief that you were justified in making the

16  stop because of that warrant, correct?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Okay.  But the actual decision to

19  pull over the vehicle and make that stop, that wasn't

20  your decision; is that fair to say?

21           THE WITNESS:  Yes, we were there -- that was --

22  our role was to stop the car for another agency.

23           THE COURT:  So it was -- the other agency made

24  the decision, "Now we'd like you to stop the vehicle.

25  Please do that at this time."  Is that what happened?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 47 of 62

1          THE WITNESS:  Yes, sir.

2          THE COURT:  So it wasn't your decision?

3          THE WITNESS:  No.

4          THE COURT:  Very good.

5      Anything else, Mr. Edwards?

6          MR. EDWARDS:  No, Your Honor.

7          THE COURT:  Mr. Wassmer?

8          MR. WASSMER:  No, Your Honor.

9          THE COURT:  All right.  Thank you, Officer.

10  You may be excused.

11          MR. EDWARDS:  May I have just one moment, Your

12  Honor?

13          THE COURT:  Yes, you may.

14      (Government counsel conferred.)

15          MR. EDWARDS:  Thank you, Your Honor.  At this

16  time, the government doesn't have any further evidence.

17          THE COURT:  All right.  Mr. Wassmer, I take it

18  you don't have any further evidence.

19          MR. WASSMER:  I do not, Your Honor.

20          THE COURT:  Okay.  I know we have some time and

21  we could argue things, if that's what you really want to

22  do.  But I have some questions that perhaps might be

23  better addressed in briefing, but I'll hear from you

24  anyway about them.

25      For you, Mr. Wassmer, I guess I'm -- it's not

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 48 of 62

```
1   something you addressed in your opening brief
2   necessarily.  I guess I'm curious as to what support you
3   have for your standing argument.  I'm curious as to your
4   resistance, if you have any, as to why there wasn't
5   consent to search the vehicle or why, even if there
6   wasn't a warrant here, there's not probable cause to
7   search the vehicle based on everything law enforcement
8   had learned during the course of the investigation that
9   led up to the stop.  So that might be something you want
10  to take up in the course of some post-hearing briefs.
11       And then, I guess, for both sides, I know it's come
12  up -- I don't know as it's come up directly in the cases
13  that you've cited.  I don't think it has.  But the
14  business about "any vehicle" the defendant's in.
15  Certainly, I would hope, that's come up before sometime.
16            MR. WASSMER:  Surprisingly, not much --
17            THE COURT:  Yeah.
18            MR. WASSMER:  -- if at all.
19            THE COURT:  But it does raise at least some
20  interesting questions about that.  Would that include --
21  you know, this wasn't a Greyhound bus.  Thank God.  But,
22  you know, if you stop a Greyhound bus, do you get to
23  search the whole bus because there's an "any vehicle"
24  warrant?  I'm not saying that's a factual circumstance
25  that necessarily has anything to do with this case, but
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 49 of 62

 1  it's -- I'm curious about any additional authority either

 2  of you might find with respect to the concept of kind of

 3  an open-ended which vehicle law enforcement could search.

 4  So those are my thoughts.  Would the parties like some

 5  time to provide additional authority on any of those

 6  issues or anything else that may have come up today?

 7      Your thoughts, Mr. Wassmer?

 8          MR. WASSMER:  I would like an opportunity to do

 9  post-hearing briefing.

10          THE COURT:  Okay.  And how long do you need for

11  that?

12          MR. WASSMER:  Probably end of next week.

13          THE COURT:  Very good.

14      Mr. Edwards, your thoughts about arguments or

15  post-hearing briefs.

16          MR. EDWARDS:  Certainly, the government can

17  file a post-hearing brief and try and narrow down even

18  more the government's argument that the search warrant

19  was supported by probable cause, even this "any vehicle"

20  language.

21      As I was preparing for this specific hearing, I also

22  realized, in the government's lengthy brief, I forgot to

23  address explicitly the defendant's "fruit of the

24  poisonous tree" argument.  Just briefly, the government's

25  argument on that is the Court would have to disagree with

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 50 of 62

1  us on every alternative argument we make before we even

2  get to that stage.  But if the Court is allowing

3  post-hearing briefing, I would also just include that.

4  That way, it's not forgotten or left out.  That was just

5  a mistake on my part.

6          THE COURT:  Certainly, you can address that in

7  your post-hearing brief.  And I don't see it in your

8  table of contents, but is there an argument here about

9  inevitable discovery?

10          MR. EDWARDS:  There is.  It's a subcomponent.

11  It's the last argument the government makes.  It's a

12  subcomponent of the exclusionary rule doesn't apply here.

13  So the government first -- in kind of prong A of that,

14  just the Word format didn't let me go as many subheadings

15  that I had.  There's a good-faith argument and then

16  there's an inevitable discovery argument.

17          THE COURT:  Yeah, I do see that now that I've

18  turned to the back of the brief.

19      And that might be something you want to address,

20  Mr. Wassmer.

21      I guess I have some concerns about the fact that law

22  enforcement decided to stop the vehicle instead of

23  letting it run its routine course, letting the defendant

24  out of the vehicle, and then they go through their

25  procedure and they search it and they find it.  They

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 51 of 62

```
1   still have the evidence.  They just haven't done the
2   search either outside of Cedar County or it -- they would
3   have found it just in the routine course of their
4   investigation.  So that might be something you want to
5   take up also in your post-hearing brief.  I have concerns
6   about that.
7       All right.  Anything else that you think we should
8   address or any arguments you just want to make on the
9   record this morning?  Mr. Edwards?
10          MR. EDWARDS:  Not that I can think of, Judge.
11  Thank you for the time this morning.
12          THE COURT:  And, Mr. Wassmer, anything we need
13  to address from your perspective?
14          MR. WASSMER:  What deadline did you want to
15  set?  Did you want that a week from Friday?
16          THE COURT:  Yeah, a week from Friday.  And I'm
17  not setting up a staggered briefing schedule.  Just by
18  the close of -- or I guess 5 o'clock on Friday.
19          MR. WASSMER:  Okay.
20          MR. EDWARDS:  Just so the Court knows, unless
21  the government has something new to add in rebuttal to
22  the defendant's post-hearing brief on the issues that the
23  government has already briefed, the government wouldn't
24  intend on filing a resistance.  I just didn't want the
25  Court to see that and think anything.  I just don't want
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 52 of 62

1  to duplicate my written work.

2          THE COURT:  I appreciate that.  All right.

3  Thank you, all.  That will conclude our hearing.

4      (Proceedings concluded at 9:57 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 53 of 62

1                C E R T I F I C A T E

2          I, Patrice A. Murray, a Certified Shorthand
Reporter of the State of Iowa, do hereby certify that at
3    the time and place heretofore indicated, a hearing was
held before the Honorable Mark A. Roberts; that I
4    reported in shorthand and transcribed to the best of my
ability the proceedings of said hearing; and that the
5    foregoing transcript is a true record of all proceedings
had on the taking of said hearing at the above time and
6    place.

7          I further certify that I am not related to or
employed by any of the parties to this action, and
8    further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or
9    financially interested in the action.

10        IN WITNESS WHEREOF, I have set my hand this 3rd day
of January, 2025.

11

12                    /s/ Patrice A. Murray
13                    Patrice A. Murray, CSR, RMR, FCRR
                      Court Reporter
14                    PO Box 10541
                      Cedar Rapids, Iowa 52410
15

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 54 of 62

**'** 
**'24** [1] - 34:16

**/**

**/s** [1] - 54:12

**1**

**1** [7] - 1:10, 2:11, 8:14, 8:18, 8:20, 13:8, 13:9
**1/3/25** [1] - 1:21
**10541** [2] - 1:24, 54:14
**111** [2] - 1:10, 1:17
**12/27/24** [1] - 1:21
**13** [1] - 15:2
**13th** [2] - 26:7, 28:2

**2**

**2** [1] - 13:8
**2010** [1] - 27:21
**2024** [9] - 1:17, 12:15, 12:17, 15:2, 15:13, 27:6, 27:16, 33:23, 35:1
**2025** [1] - 54:10
**24-CR-70** [2] - 1:5, 3:4
**27** [1] - 2:4
**28** [2] - 15:13, 27:16
**28th** [12] - 15:17, 16:17, 17:2, 24:7, 24:12, 25:15, 26:8, 27:6, 30:2, 30:16, 31:11, 35:1
**29** [1] - 2:4
**29th** [1] - 1:17
**2:48** [1] - 30:3

**3**

**3** [1] - 20:19
**31** [1] - 2:5
**33** [1] - 2:6
**3rd** [1] - 54:10

**4**

**4** [1] - 20:20
**41** [1] - 2:6
**46** [1] - 2:7

**5**

**5** [7] - 2:11, 8:14, 8:18, 8:20, 12:15, 12:17, 52:18
**52302** [1] - 1:13
**52401** [1] - 1:11

**52410** [2] - 1:24, 54:14
**5320** [1] - 1:12
**5th** [6] - 12:21, 13:10, 14:15, 24:6, 26:7, 28:2

**7**

**7** [1] - 2:14

**8**

**8** [1] - 2:11
**8:00** [2] - 43:5, 43:6

**9**

**9** [1] - 2:3
**9:01** [1] - 1:18
**9:57** [1] - 53:4

**A**

**a.m** [3] - 1:18, 43:5, 53:4
**ability** [2] - 6:10, 54:4
**able** [2] - 3:10, 18:4
**acting** [2] - 10:2, 20:15
**Action** [2] - 34:1, 34:3
**action** [2] - 54:7, 54:9
**actions** [2] - 22:25, 35:17
**activities** [1] - 37:4
**actual** [2] - 17:1, 47:18
**add** [1] - 52:21
**additional** [4] - 4:2, 6:13, 6:16, 32:9, 50:1, 50:5
**address** [4] - 43:13, 50:23, 51:6, 51:19, 52:8, 52:13
**addressed** [2] - 48:23, 49:1
**adjust** [1] - 9:6, 33:5
**admitted** [3] - 7:19, 8:7, 8:19
**advance** [1] - 41:19
**affidavit** [4] - 4:22, 5:1, 5:4, 27:16
**affirmed** [2] - 9:3, 33:2
**affixed** [1] - 24:8
**agency** [6] - 12:5, 42:5, 42:8, 42:9, 47:22, 47:23
**ago** [1] - 44:19
**agree** [4] - 4:23, 5:8, 6:2, 6:3
**agreement** [1] - 11:15
**ahead** [1] - 12:22
**allow** [1] - 22:1
**allowed** [1] - 46:2
**allowing** [1] - 51:2
**alternative** [1] - 51:1
**America** [1] - 3:3
**AMERICA** [1] - 1:3
**amount** [1] - 26:1
**analysis** [2] - 5:9, 5:13

**AND** [1] - 1:10
**Andre** [1] - 20:24
**anyway** [1] - 48:24
**apart** [1] - 18:11
**APPEARANCES** [1] - 1:9
**appeared** [2] - 1:11, 1:13
**application** [1] - 27:24
**apply** [1] - 51:12
**appreciate** [1] - 53:2
**apprise** [1] - 6:5
**apprised** [2] - 35:17, 36:3, 36:9
**approached** [2] - 38:20, 39:20
**appropriate** [1] - 8:5
**area** [7] - 9:18, 15:23, 19:25, 26:2, 28:11, 40:9, 40:11
**argue** [1] - 48:21
**argument** [15] - 4:13, 5:3, 6:6, 6:25, 7:13, 8:9, 49:3, 50:18, 50:24, 50:25, 51:1, 51:8, 51:11, 51:15, 51:16
**arguments** [5] - 5:23, 6:20, 7:9, 50:14, 52:8
**arrange** [1] - 15:14
**arrive** [2] - 38:24, 38:25
**arrived** [4] - 23:12, 23:14, 39:16, 39:19
**arriving** [1] - 36:5
**articulate** [2] - 25:21, 40:23
**assist** [1] - 34:17
**Assistant** [1] - 3:5
**assisting** [3] - 17:15, 17:22, 18:7
**associated** [3] - 16:21, 35:15, 36:7
**attached** [2] - 9:18, 9:20
**attempt** [2] - 15:18, 16:11
**attend** [1] - 35:5
**ATTORNEY** [1] - 1:12
**attorney** [2] - 3:7, 54:8
**Attorney's** [1] - 1:10
**Attorneys** [1] - 3:5
**ATTORNEYS** [1] - 1:10
**AUSTIN** [3] - 2:5, 33:1, 33:14
**Austin** [3] - 3:19, 32:20, 33:14
**authored** [3] - 35:13, 42:4, 42:7
**authority** [1] - 50:1, 50:5
**Avenue** [2] - 1:10, 1:17
**averments** [1] - 4:21
**aware** [1] - 42:16

**B**

**B-A-I-L-E-Y** [1] - 33:15
**B-O-H-L-I-N-G** [1] - 9:14
**backstop** [1] - 5:22
**Bailey** [3] - 3:19, 32:20,

33:15
**BAILEY** [2] - 2:5, 33:1
**barred** [3] - 39:7, 45:23
**based** [7] - 4:19, 5:3, 6:19, 32:9, 40:13, 40:25, 49:7
**BEFORE** [1] - 1:16
**beforehand** [1] - 11:10
**begin** [3] - 6:23, 13:3, 15:23
**behalf** [3] - 1:11, 1:13, 11:21
**belief** [2] - 45:15, 47:15
**Benz** [1] - 27:21
**best** [2] - 16:1, 54:4
**better** [1] - 48:23
**black** [2] - 36:16, 44:17
**block** [1] - 14:9
**body** [5] - 11:13, 11:17, 14:24, 15:8, 21:23
**BOHLING** [2] - 2:3, 9:2
**Bohling** [3] - 3:19, 8:22, 9:14
**box** [1] - 32:22
**Box** [3] - 1:10, 1:24, 54:14
**boyfriend** [1] - 29:14
**brief** [11] - 12:22, 15:22, 38:21, 44:5, 49:1, 50:17, 50:22, 51:7, 51:18, 52:5, 52:22
**briefed** [5] - 13:1, 23:7, 35:11, 35:20, 52:23
**briefing** [17] - 17:2, 17:5, 17:8, 17:20, 17:25, 35:6, 35:9, 35:16, 35:24, 36:4, 36:9, 36:17, 40:18, 48:23, 50:9, 51:3, 52:17
**briefings** [2] - 19:10, 19:23
**briefly** [2] - 37:19, 50:24
**briefs** [2] - 49:10, 50:15
**building** [2] - 43:13, 43:18
**burden** [4] - 6:8, 6:13, 7:3, 8:8
**burdens** [1] - 6:17
**bus** [3] - 49:21, 49:22, 49:23
**business** [1] - 49:14
**buy** [7] - 17:16, 21:24, 25:14, 28:14, 35:21, 44:8, 45:15
**buys** [2] - 26:6, 28:3
**BY** [15] - 2:3, 2:4, 2:4, 2:5, 2:6, 2:6, 2:7, 9:11, 27:4, 29:22, 31:9, 33:11, 34:9, 41:11, 46:10

**C**

**call** [5] - 3:16, 3:18, 3:21, 3:22, 14:8
**called** [3] - 6:4, 9:3, 33:2
**calling** [3] - 3:23, 4:5, 5:14
**calls** [2] - 8:22, 32:20
**calm** [2] - 23:16, 28:17
**capacity** [1] - 10:2
**car** [9] - 21:10, 21:11, 26:4,

30:10, 37:24, 38:7, 38:23, 41:3, 47:22

**case** [13] - 10:10, 10:19, 11:3, 11:8, 11:19, 12:2, 13:8, 13:12, 13:20, 16:16, 39:14, 46:14, 49:25

**cases** [1] - 49:12

**Cedar** [31] - 1:10, 1:18, 1:24, 5:18, 15:23, 16:25, 17:3, 17:10, 17:15, 17:17, 17:22, 19:11, 20:22, 22:10, 23:7, 25:16, 31:15, 33:19, 33:20, 33:24, 35:6, 35:10, 36:22, 37:3, 38:14, 38:24, 39:16, 39:19, 44:4, 52:2, 54:14

**certain** [1] - 18:14

**certainly** [7] - 3:18, 7:5, 7:7, 8:5, 49:15, 50:16, 51:6

**Certified** [2] - 1:19, 54:2

**certify** [1] - 54:2, 54:7

**chair** [1] - 9:7, 33:6

**challenge** [1] - 6:10

**channel** [1] - 19:9

**CI** [4] - 37:18, 38:21, 39:20, 41:1

**CI's** [2] - 28:1, 37:20

**circumstance** [2] - 30:14, 49:24

**circumstances** [1] - 30:9

**cited** [2] - 4:10, 49:13

**city** [1] - 34:11

**clarification** [1] - 29:23, 31:7

**clear** [1] - 30:23

**close** [2] - 18:23, 52:18

**closed** [1] - 19:5

**comfortable** [3] - 5:14, 9:6, 33:5

**coming** [3] - 28:17, 35:25, 38:22

**commencing** [1] - 1:18

**comments** [1] - 13:2

**committing** [1] - 45:19

**common** [2] - 18:2, 34:17

**communicate** [1] - 36:22

**communicating** [1] - 18:20

**communication** [1] - 18:8

**Community** [2] - 34:1, 34:3

**compartment** [1] - 20:9

**complete** [2] - 11:15, 14:14

**Completed** [1] - 1:21

**completed** [1] - 39:24

**concept** [1] - 50:2

**concerns** [3] - 13:2, 51:21, 52:5

**conclude** [1] - 53:3

**concluded** [3] - 24:1, 28:9, 53:4

**conclusion** [1] - 5:8

**conduct** [9] - 10:15, 12:12, 15:18, 23:8, 25:18, 28:23, 31:17, 38:6, 38:15

**conducted** [4] - 13:15, 31:25, 40:12, 40:17

**conducting** [5] - 13:11, 20:24, 26:9, 36:1, 37:22

**conferred** [2] - 32:11, 48:14

**confidential** [7] - 10:6, 11:15, 12:3, 19:12, 20:16, 26:15

**conflict** [1] - 3:24

**connection** [1] - 3:10

**consent** [8] - 11:11, 11:13, 15:8, 26:11, 26:12, 26:17, 26:21, 49:5

**consented** [1] - 14:23

**constantly** [1] - 18:19

**contain** [1] - 27:19

**contending** [1] - 4:25

**contents** [1] - 51:8

**continue** [1] - 12:9

**continued** [1] - 23:3

**contraband** [1] - 13:23

**control** [1] - 11:25, 23:17

**controlled** [46] - 10:15, 11:9, 12:12, 12:19, 14:1, 14:2, 14:3, 14:16, 14:22, 15:1, 15:14, 15:18, 16:16, 17:1, 17:16, 17:18, 18:6, 18:15, 18:22, 19:6, 20:2, 20:12, 21:24, 23:18, 24:6, 24:7, 25:14, 26:6, 26:16, 26:19, 27:16, 28:3, 28:14, 30:1, 31:16, 31:17, 34:18, 35:18, 35:21, 36:1, 36:24, 37:5, 38:3, 45:15, 46:18, 46:20

**conversation** [3] - 26:20, 39:3, 39:4

**conversations** [1] - 15:10

**conveyance** [1] - 11:24

**conveyed** [5] - 11:19, 11:20, 16:7, 16:8, 21:17

**conviction** [1] - 29:10

**cooperator's** [1] - 46:13

**copy** [2] - 40:16, 40:18, 41:18

**corners** [3] - 4:20, 5:3, 5:10

**correct** [22] - 14:18, 16:9, 19:9, 22:18, 27:7, 27:8, 27:21, 36:2, 37:25, 38:10, 42:24, 44:1, 44:2, 45:5, 45:8, 45:12, 45:13, 45:16, 45:17, 45:20, 45:21, 47:16

**correctly** [1] - 36:6

**counsel** [5] - 3:23, 6:5, 6:6, 48:14, 54:8

**counting** [1] - 22:7

**County** [29] - 5:18, 5:21, 9:16, 9:19, 9:21, 10:1, 10:20, 16:25, 17:3, 17:11, 17:15, 17:17, 19:11, 22:10, 25:2, 25:4, 25:7, 25:8, 25:16, 30:18, 35:10, 36:22, 38:14, 38:24,

39:16, 39:19, 44:4, 45:5, 52:2

**county** [2] - 16:22, 16:24

**County's** [1] - 37:3

**couple** [2] - 13:4, 16:8

**course** [4] - 49:8, 49:10, 51:23, 52:3

**COURT** [57] - 1:1, 3:2, 3:11, 3:12, 4:1, 4:7, 5:7, 5:15, 6:15, 6:21, 7:8, 7:14, 7:17, 7:19, 7:21, 7:24, 8:7, 8:16, 8:18, 8:23, 9:5, 26:25, 29:19, 30:5, 30:8, 30:12, 30:16, 30:25, 31:3, 32:8, 32:14, 32:17, 32:21, 33:4, 34:6, 41:7, 46:7, 47:9, 47:12, 47:18, 47:23, 48:2, 48:4, 48:7, 48:9, 48:13, 48:17, 48:20, 49:17, 49:19, 50:10, 50:13, 51:6, 51:17, 52:12, 52:16, 53:2

**Court** [15] - 1:23, 3:2, 6:19, 7:5, 10:8, 18:10, 19:21, 20:7, 36:20, 40:23, 50:25, 51:2, 52:20, 52:25, 54:13

**court** [4] - 3:1, 9:13, 33:13, 42:17

**covered** [4] - 17:7, 26:13, 26:17, 35:9

**crime** [1] - 34:5

**cross** [4] - 4:21, 5:10, 32:9

**CROSS** [4] - 2:4, 2:6, 27:3, 41:10

**cross-examination** [1] - 32:9

**CROSS-EXAMINATION** [4] - 2:4, 2:6, 27:3, 41:10

**cross-examine** [2] - 4:21, 5:10

**CS** [52] - 10:7, 10:9, 10:19, 11:3, 11:7, 11:8, 11:20, 12:2, 12:10, 12:12, 12:20, 13:3, 13:12, 14:4, 14:5, 14:13, 14:19, 14:23, 15:1, 15:8, 15:10, 15:14, 16:8, 19:18, 20:3, 20:8, 20:11, 20:21, 21:8, 21:13, 21:23, 22:19, 23:16, 24:2, 24:22, 25:15, 26:11, 27:12, 27:20, 28:14, 28:17, 28:20, 28:24, 29:2, 29:25, 30:24, 39:3, 39:8, 39:13, 44:13, 46:20

**CS's** [18] - 10:22, 13:19, 14:15, 19:15, 19:22, 22:12, 23:8, 23:19, 23:20, 24:8, 24:20, 26:10, 26:20, 32:5, 36:10, 36:12, 39:4

**CSR** [2] - 1:23, 54:13

**curious** [3] - 49:2, 49:3, 50:1

**D**

**date** [4] - 12:20, 15:12, 30:15, 35:7

**deadline** [1] - 52:14

**deal** [5] - 37:9, 37:23, 38:6, 38:8, 41:1

**decide** [1] - 4:19

**decided** [3] - 3:25, 30:17, 51:22

**decision** [6] - 30:19, 32:3, 47:18, 47:20, 47:24, 48:2

**defendant** [51] - 3:6, 4:13, 6:8, 6:14, 7:5, 12:13, 14:3, 14:6, 15:2, 15:10, 15:15, 16:3, 16:4, 16:7, 16:13, 16:20, 17:12, 20:1, 20:5, 20:16, 20:22, 20:23, 21:5, 21:9, 22:5, 22:11, 22:12, 22:15, 23:19, 24:14, 24:17, 25:15, 25:25, 29:25, 30:9, 31:10, 31:25, 32:5, 32:12, 35:2, 36:4, 36:10, 37:10, 37:12, 37:16, 37:17, 37:19, 39:21, 44:6, 44:21, 51:23

**Defendant** [2] - 1:7, 1:13

**defendant's** [11] - 3:8, 7:3, 16:5, 24:11, 31:13, 31:18, 31:19, 31:21, 49:14, 50:23, 52:22

**defense** [3] - 3:23, 6:5

**departed** [2] - 15:23, 19:25

**departing** [1] - 26:2

**Department** [5] - 12:7, 31:15, 33:19, 33:21, 33:25

**department** [1] - 33:18

**depending** [1] - 27:23

**deputies** [1] - 13:19

**Deputy** [1] - 3:24

**describe** [10] - 10:8, 11:7, 12:17, 15:21, 18:10, 18:18, 19:21, 20:7, 36:20, 39:6

**describes** [2] - 13:10, 20:19, 20:21

**describing** [1] - 11:6

**description** [2] - 36:12, 36:15

**destination** [1] - 14:10

**detailed** [1] - 20:20

**details** [3] - 13:7, 13:25, 41:24

**detained** [1] - 39:22

**Detective** [1] - 13:10

**detectives** [1] - 12:22, 13:5, 18:7

**determined** [2] - 17:9, 31:1

**different** [4] - 19:9, 30:13, 42:8, 42:9

**Dillan** [1] - 3:5

**DILLAN** [1] - 1:10

**DIRECT** [4] - 2:3, 2:6, 9:10, 33:10

**direct** [1] - 38:15

**directed** [4] - 11:22, 22:23, 23:8, 38:11

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 56 of 62

**direction** [2] - 18:20, 28:4
**directly** [1] - 49:12
**disagree** [2] - 5:7, 50:25
**disagrees** [1] - 7:5
**discovering** [1] - 10:12
**discovery** [3] - 8:2, 51:9, 51:16
**discussed** [4] - 21:3, 26:7, 36:25, 37:7
**dispatch** [1] - 18:4
**distance** [1] - 38:4
**distribution/manufacturing** [2] - 9:25
**DISTRICT** [2] - 1:1, 1:1
**Dollar** [1] - 21:8
**done** [4] - 19:14, 38:6, 38:8, 52:1
**dovetail** [1] - 6:25
**down** [4] - 23:17, 28:17, 41:1, 50:17
**dozen** [1] - 42:15
**drive** [2] - 24:18, 46:2
**driver** [7] - 24:22, 30:17, 39:7, 39:12, 41:13, 45:22, 46:2
**driver's** [5] - 29:3, 29:5, 38:20, 39:4, 39:9
**driving** [6] - 5:6, 27:20, 29:10, 29:16, 44:13, 44:23
**dropped** [1] - 30:9
**drove** [1] - 21:9
**drug** [8] - 9:18, 25:3, 34:18, 37:9, 37:23, 41:1, 45:15
**Drug** [3] - 9:19, 9:21, 10:20
**drugs** [5] - 10:14, 35:23, 37:20, 37:24, 45:16
**duly** [2] - 9:3, 33:2
**duplicate** [1] - 53:1
**during** [24] - 11:5, 11:21, 16:10, 17:25, 18:6, 18:22, 20:2, 20:3, 21:24, 22:2, 23:20, 26:6, 26:19, 29:25, 35:9, 35:16, 35:18, 36:4, 36:9, 36:17, 38:18, 39:3, 39:12, 49:8
**duties** [2] - 9:23, 34:2

## E

**ears** [1] - 14:11
**EDWARDS** [36] - 1:10, 2:3, 2:4, 2:5, 2:6, 2:7, 3:17, 5:12, 6:3, 6:24, 7:18, 8:4, 8:13, 8:21, 9:9, 9:11, 26:23, 29:22, 30:4, 31:7, 31:9, 32:7, 32:19, 33:9, 33:11, 34:9, 41:5, 46:10, 47:8, 48:6, 48:11, 48:15, 50:16, 51:10, 52:10, 52:20
**Edwards** [19] - 3:6, 3:15, 5:8, 6:2, 6:23, 8:12, 9:8, 26:25,

30:5, 31:6, 32:8, 32:17, 33:8, 41:7, 46:8, 47:9, 48:5, 50:14, 52:9
**effect** [1] - 5:20
**effectuate** [1] - 17:18
**either** [7] - 4:10, 20:3, 27:23, 28:4, 44:23, 50:1, 52:2
**emphasis** [2] - 34:4, 34:10
**employed** [5] - 9:15, 9:16, 33:16, 54:7, 54:8
**employee** [1] - 54:8
**en** [1] - 15:23
**end** [1] - 50:12
**ended** [1] - 50:3
**enforcement** [19] - 10:23, 11:21, 11:22, 11:25, 12:11, 12:18, 13:16, 14:24, 15:9, 15:13, 16:12, 20:24, 21:6, 23:1, 31:12, 31:17, 49:7, 50:3, 51:22
**enforcement's** [1] - 31:24
**entire** [2] - 22:2, 39:12
**entirety** [1] - 14:22
**equipment** [1] - 36:18
**equipped** [1] - 21:23
**escorted** [1] - 39:24
**essentially** [12] - 10:22, 11:20, 13:11, 14:23, 15:12, 20:15, 22:10, 24:1, 31:2, 35:21, 38:2, 46:13
**establish** [3] - 3:10, 5:4, 8:8
**establishes** [1] - 7:11
**evening** [2] - 16:17, 17:2
**events** [1] - 18:14
**evidence** [14] - 3:20, 4:2, 5:17, 5:25, 6:9, 6:18, 7:10, 7:13, 8:10, 8:11, 8:15, 48:16, 48:18, 52:1
**evidentiary** [2] - 6:1, 6:13
**exact** [1] - 38:11
**exactly** [4] - 5:13, 20:10, 26:3, 41:2
**examination** [1] - 32:9
**EXAMINATION** [14] - 2:3, 2:4, 2:4, 2:5, 2:6, 2:6, 2:7, 9:10, 27:3, 29:21, 31:8, 33:10, 41:10, 46:9
**examine** [2] - 4:21, 5:10
**examined** [2] - 9:4, 33:3
**example** [3] - 42:25, 43:12, 44:17
**exclusionary** [1] - 51:12
**excused** [2] - 32:15, 48:10
**execute** [2] - 42:2, 43:23
**executed** [8] - 41:23, 42:4, 42:6, 42:10, 43:5, 43:9, 47:1
**executing** [4] - 5:20, 45:11, 46:17, 47:4
**execution** [1] - 45:4
**Exhibit** [3] - 13:9, 20:19, 20:20

**exhibits** [4] - 4:2, 4:4, 7:11, 7:15
**EXHIBITS** [1] - 2:10
**Exhibits** [6] - 2:11, 2:14, 7:20, 8:14, 8:18, 8:20
**exit** [1] - 21:7
**experience** [1] - 25:1
**explain** [1] - 14:8
**explained** [4] - 10:8, 12:10, 17:14, 39:25
**explanation** [2] - 17:24, 26:8
**explicit** [1] - 26:20
**explicitly** [2] - 26:10, 50:23
**eyes** [1] - 14:11

## F

**fact** [3] - 10:19, 22:7, 51:21
**fact-specific** [1] - 10:19
**factor** [1] - 29:1
**factual** [2] - 25:14, 49:24
**fair** [1] - 47:20
**fairly** [1] - 38:25
**faith** [1] - 51:15
**false** [1] - 5:1
**far** [1] - 43:10
**FCRR** [2] - 1:23, 54:13
**fear** [1] - 31:24
**February** [27] - 12:15, 12:17, 13:10, 14:15, 15:2, 15:13, 15:17, 16:17, 17:2, 24:6, 24:7, 24:12, 25:15, 26:7, 26:8, 27:6, 27:16, 28:2, 30:2, 30:16, 31:11, 33:23, 34:16, 35:1
**feelings** [1] - 29:4
**female** [3] - 13:12, 13:16, 13:17
**few** [4] - 3:14, 16:1, 26:1, 47:12
**Fi** [1] - 3:10
**file** [2] - 8:2, 50:17
**filed** [3] - 4:5, 7:22, 8:3
**filing** [1] - 52:24
**finally** [1] - 25:12
**financially** [1] - 54:9
**find** [5] - 31:4, 40:5, 41:3, 50:2, 51:25
**fine** [1] - 13:6
**first** [16] - 3:19, 4:13, 7:4, 7:6, 7:9, 9:3, 12:15, 20:21, 26:8, 27:5, 29:7, 29:25, 33:2, 33:14, 42:6, 51:13
**five** [1] - 28:8
**fixed** [1] - 43:18
**following** [1] - 3:1
**follows** [2] - 9:4, 33:3
**FOR** [1] - 1:1
**force** [4] - 9:18, 9:24, 25:3
**Force** [3] - 9:19, 9:21, 10:20
**foregoing** [1] - 54:11

**forgot** [1] - 50:22
**forgotten** [1] - 51:4
**format** [1] - 51:14
**former** [1] - 6:25
**forth** [1] - 6:9
**forward** [4] - 7:3, 8:24, 32:21, 36:24
**four** [9] - 4:4, 4:20, 5:3, 5:10, 7:11, 7:14, 9:22, 20:21, 33:22
**frame** [1] - 43:6
**framework** [1] - 6:16
**Franks** [3] - 4:9, 4:10, 5:9
**frequencies** [1] - 18:3
**frequency** [5] - 19:5, 19:7, 21:3, 21:18, 23:6
**Friday** [3] - 52:15, 52:16, 52:18
**front** [2] - 38:23, 39:25
**fruit** [1] - 50:23
**full** [1] - 22:13

## G

**gender** [1] - 13:17
**gender-specific** [1] - 13:17
**general** [3] - 11:24, 26:17, 36:15
**generally** [11] - 4:23, 9:23, 11:1, 11:7, 17:7, 19:22, 25:1, 34:2, 42:19, 42:22, 43:18
**gentleman** [1] - 35:22
**get** [12] - 3:13, 3:14, 5:10, 5:19, 6:21, 10:24, 14:13, 15:12, 23:17, 49:22, 51:2
**gets** [1] - 13:25
**getting** [1] - 25:25
**give** [2] - 3:15, 13:7
**given** [3] - 7:2, 36:12, 39:11
**giving** [1] - 30:23
**God** [1] - 49:21
**good-faith** [1] - 51:15
**government** [21] - 3:18, 3:20, 3:22, 3:25, 5:13, 6:4, 7:6, 7:7, 8:1, 8:4, 8:5, 8:14, 32:19, 48:14, 48:16, 50:16, 51:11, 51:13, 52:21, 52:23
**government's** [5] - 5:22, 6:6, 6:7, 6:11, 6:20, 7:1, 8:2, 8:18, 50:18, 50:22, 50:24
**Government's** [3] - 8:14, 13:9, 20:20
**GPS** [1] - 24:7
**Greyhound** [2] - 49:21, 49:22
**group** [1] - 18:12
**guess** [12] - 5:22, 6:24, 7:1, 7:4, 12:24, 16:4, 26:14, 48:25, 49:2, 49:11, 51:21, 52:18
**gun** [2] - 34:5, 34:11
**guns** [1] - 42:25

## H

**hand** [7] - 9:1, 15:25, 16:15, 16:19, 32:24, 40:16, 54:10
**handcuffs** [1] - 39:22
**happen** [2] - 14:20, 17:16
**happened** [12] - 14:4, 19:22, 19:24, 21:6, 21:12, 23:2, 24:3, 25:14, 37:14, 37:15, 38:17, 47:25
**happening** [1] - 44:8
**heading** [1] - 25:15
**hear** [3] - 9:7, 33:7, 48:23
**hearing** [18] - 3:8, 4:8, 6:1, 6:17, 6:22, 49:10, 50:9, 50:15, 50:17, 50:21, 51:3, 51:7, 52:5, 52:22, 53:3, 54:3, 54:4, 54:5
**HEARING** [1] - 1:15
**held** [3] - 3:1, 17:21, 54:3
**HELD** [1] - 1:16
**help** [1] - 34:19
**hereby** [1] - 54:2
**hereto** [1] - 54:8
**heretofore** [1] - 54:3
**highway** [1] - 23:4
**himself** [1] - 22:16
**home** [3] - 17:11, 22:10, 23:4
**HON** [1] - 1:16
**Honor** [20] - 3:17, 5:12, 6:24, 7:18, 26:24, 27:2, 29:18, 30:4, 30:7, 32:13, 32:19, 41:6, 41:9, 46:6, 47:8, 48:6, 48:8, 48:12, 48:15, 48:19
**Honorable** [1] - 54:3
**hope** [1] - 49:15
**hours** [3] - 6:22, 16:1, 16:8
**hypothetical** [1] - 25:13

## I

**ID** [1] - 39:10
**identified** [2] - 20:23, 44:16
**identify** [1] - 11:2
**identity** [2] - 31:13, 31:22
**imagine** [2] - 5:7, 37:20
**important** [1] - 43:21
**IN** [2] - 1:1, 54:10
**include** [3] - 46:23, 49:20, 51:3
**included** [4] - 10:5, 44:10, 44:12, 45:1
**including** [2] - 22:1, 40:2
**INDEX** [1] - 2:1
**indicate** [2] - 28:20, 47:13
**indicated** [4] - 6:19, 29:13, 43:25, 54:3
**individual** [2] - 25:24, 30:23
**inevitable** [2] - 51:9, 51:16
**informant** [2] - 10:6, 10:10

**information** [6] - 5:2, 24:14, 24:17, 27:20, 44:3, 44:25
**informed** [2] - 44:9, 44:12
**initial** [10] - 6:8, 7:3, 10:11, 11:2, 12:10, 20:11, 20:13, 26:14, 26:15, 35:16
**initialling** [1] - 11:16
**initials** [1] - 11:23
**initiated** [2] - 23:11, 38:17
**inside** [2] - 26:4, 40:2
**instance** [1] - 17:12
**instead** [2] - 46:19, 51:22
**instruct** [1] - 20:3
**instructed** [1] - 20:8
**insufficient** [1] - 5:4
**intend** [2] - 3:16, 52:24
**interaction** [1] - 39:12
**interested** [1] - 54:9
**interesting** [2] - 4:17, 49:20
**interview** [5] - 10:11, 11:2, 11:3, 11:15, 11:6
**invalid** [1] - 5:23
**investigate** [1] - 9:25
**investigating** [1] - 35:2
**investigation** [10] - 10:3, 10:5, 35:5, 35:11, 36:18, 39:17, 44:6, 46:23, 49:8, 52:4
**Investigator** [1] - 8:22
**investigator** [2] - 8:23, 17:21
**investigators** [11] - 17:21, 22:1, 25:23, 34:17, 35:11, 35:17, 36:23, 38:12, 38:15, 38:24, 39:16
**involve** [1] - 37:10
**involved** [5] - 12:23, 19:1, 19:6, 19:7, 39:14
**involvement** [1] - 46:13
**involving** [2] - 35:12, 40:1
**IOWA** [1] - 1:1
**Iowa** [9] - 1:11, 1:13, 1:18, 1:24, 12:6, 25:10, 45:5, 54:2, 54:14
**issue** [3] - 4:18, 5:20, 7:2
**issued** [4] - 4:9, 4:15, 4:16, 27:6
**issues** [3] - 3:9, 50:6, 52:22
**issuing** [2] - 4:18, 42:17
**items** [3] - 5:18, 5:19, 42:22

## J

**Jackson** [3] - 3:24, 5:14, 27:10
**jail** [2] - 10:24, 29:8
**January** [1] - 54:10
**Jared** [1] - 3:6
**JARED** [1] - 1:10
**Judge** [2] - 8:13, 52:10
**judgment** [1] - 3:22
**justified** [1] -

## K

**keep** [1] - 22:15
**kept** [1] - 22:17
**kind** [28] - 3:22, 6:3, 6:25, 10:8, 11:1, 11:24, 13:5, 13:6, 13:25, 14:4, 14:10, 17:14, 18:3, 18:7, 19:5, 25:1, 25:12, 26:8, 26:16, 30:1, 34:2, 34:21, 38:1, 43:13, 44:8, 46:17, 50:2, 51:13
**knowledge** [3] - 16:20, 18:2, 37:7
**knows** [1] - 52:20

## L

**language** [1] - 50:20
**large** [1] - 40:6
**largely** [1] - 6:19
**last** [6] - 3:23, 6:5, 24:25, 28:13, 33:14, 51:11
**law** [21] - 10:23, 11:21, 11:22, 11:24, 12:11, 12:18, 13:16, 14:23, 15:9, 15:13, 16:12, 20:24, 21:6, 22:25, 25:10, 31:12, 31:17, 31:24, 49:7, 50:3, 51:21
**Law** [1] - 1:12
**lawyers** [1] - 31:5
**lead** [2] - 22:5, 26:16
**learn** [1] - 37:6
**learned** [2] - 31:21, 49:8
**least** [7] - 4:9, 5:17, 5:18, 5:25, 8:9, 19:11, 49:19
**leaving** [1] - 37:18
**led** [5] - 5:13, 17:5, 49:9
**left** [7] - 5:2, 8:24, 13:21, 28:10, 32:23, 37:21, 51:4
**legal** [1] - 5:20
**lengthy** [1] - 50:22
**less** [1] - 26:1
**letting** [1] - 51:23
**license** [7] - 29:3, 29:5, 29:11, 39:4, 39:9, 44:18, 45:23
**lights** [1] - 18:22
**likely** [1] - 44:8
**limited** [6] - 5:17, 42:16, 42:19, 42:22, 43:4, 43:8
**limits** [1] - 43:22
**line** [2] - 24:10, 24:25
**Linn** [5] - 5:21, 30:18, 45:5
**listen** [1] - 18:7
**listening** [5] - 14:24, 19:8, 23:6, 37:1, 38:1
**live** [5] - 14:24, 15:9, 18:25, 22:2, 23:6
**located** [3] - 16:21, 40:7, 40:10

**location** [3] - 12:22, 38:11, 43:18
**looking** [4] - 38:9, 42:25, 43:1

## M

**machine** [1] - 1:20
**made** [4] - 7:1, 8:9, 47:14, 47:23
**make** [5] - 22:12, 30:18, 47:19, 51:1, 52:8
**makes** [1] - 51:11
**making** [4] - 6:20, 10:18, 18:21, 47:15
**Manternach** [1] - 3:6
**MANTERNACH** [1] - 1:10
**Marion** [1] - 1:13
**Mark** [1] - 54:3
**MARK** [1] - 1:16
**marked** [1] - 34:24
**material** [1] - 5:2
**Matt** [3] - 3:24, 5:14, 27:10
**matter** [2] - 3:2, 3:7
**McDowell** [10] - 1:6, 3:4, 4:15, 5:6, 27:13, 35:3, 35:12, 39:18, 41:15, 44:10
**McNairy** [2] - 20:24, 21:7
**mean** [1] - 5:16
**meaning** [1] - 19:5
**meet** [5] - 6:12, 12:21, 12:22, 14:9, 19:11
**meeting** [8] - 10:20, 12:10, 20:11, 20:13, 25:24, 26:15, 27:12, 35:22
**member** [1] - 34:1
**memory** [1] - 29:6
**mention** [1] - 45:14
**mentioned** [4] - 28:16, 29:7, 29:24, 45:22
**Mercedes** [3] - 27:21, 36:16, 44:17
**Mercedes-Benz** [1] - 27:21
**message** [3] - 18:12, 21:20
**met** [13] - 8:8, 20:23, 21:5, 22:11, 29:7, 31:10, 35:10, 37:12, 37:16, 37:17, 38:20, 41:13, 41:15
**methamphetamine** [16] - 14:5, 14:7, 14:12, 15:25, 20:4, 20:17, 21:14, 22:6, 22:14, 22:20, 23:1, 23:23, 26:3, 28:10, 40:6, 41:3
**microphone** [2] - 9:6, 33:5
**might** [7] - 4:17, 45:16, 48:22, 49:9, 50:2, 51:19, 52:4
**mind** [1] - 14:11
**minimum** [1] - 28:5
**minute** [1] - 39:2
**minutes** [3] - 23:13, 26:1,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR      Document 43      Filed 01/03/25      Page 58 of 62

28:8
**mistake** [1] - 51:5
**mittimus** [1] - 10:25
**moment** [1] - 48:11
**money** [2] - 13:7, 22:8
**monitor** [1] - 38:5
**monitored** [1] - 37:3
**months** [1] - 44:19
**morning** [5] - 3:16, 6:23, 8:12, 52:9, 52:11
**MOTION** [1] - 1:15
**motion** [1] - 3:8
**motivation** [1] - 10:22
**moved** [1] - 21:13
**moves** [1] - 8:14
**MR** [62] - 2:3, 2:4, 2:4, 2:5, 2:6, 2:6, 2:7, 3:17, 4:4, 4:25, 5:12, 6:3, 6:18, 6:24, 7:10, 7:16, 7:18, 7:22, 8:1, 8:4, 8:13, 8:17, 8:21, 9:9, 9:11, 26:23, 27:2, 27:4, 29:17, 29:22, 30:4, 30:7, 31:7, 31:9, 32:7, 32:13, 32:19, 33:9, 33:11, 34:9, 41:5, 41:9, 41:11, 46:5, 46:10, 47:8, 47:11, 48:6, 48:8, 48:11, 48:15, 48:19, 49:16, 49:18, 50:8, 50:12, 50:16, 51:10, 52:10, 52:14, 52:19, 52:20
**Mullins** [1] - 3:21
**Murray** [5] - 1:19, 1:23, 54:2, 54:12, 54:13
**Muscatine** [9] - 9:16, 9:19, 9:20, 10:1, 10:20, 25:2, 25:4, 25:6, 25:8

## N

**name** [5] - 9:12, 33:12, 33:14, 39:11
**Narcotics** [1] - 12:7
**narcotics** [3] - 10:1, 10:12, 43:2
**narrating** [1] - 18:25
**narrow** [1] - 50:17
**necessarily** [2] - 49:2, 49:25
**necessary** [1] - 3:25
**need** [9] - 5:16, 5:18, 5:25, 6:1, 33:6, 34:19, 34:24, 50:10, 52:12
**negative** [2] - 13:23, 13:24
**never** [1] - 42:4
**new** [1] - 52:21
**next** [10] - 5:16, 15:1, 19:22, 21:6, 23:2, 24:10, 38:18, 39:17, 39:23, 50:12
**Nicole** [1] - 13:10
**night** [1] - 3:23
**normally** [2] - 42:2, 43:11
**NORTHERN** [1] - 1:1

**nothing** [3] - 29:17, 46:5, 47:11
**noticed** [1] - 3:22
**nuance** [1] - 6:4
**number** [3] - 3:4, 42:15, 44:18

## O

**o'clock** [1] - 52:18
**objection** [4] - 7:17, 8:6, 8:16, 8:17
**observations** [1] - 46:24
**observe** [1] - 20:25
**observed** [3] - 21:15, 23:3, 45:19
**obtain** [2] - 16:12, 25:6
**obtained** [8] - 22:5, 27:7, 27:9, 27:12, 29:24, 42:7, 42:9, 42:11
**obtaining** [1] - 14:5
**obvious** [1] - 24:10
**obviously** [1] - 6:11
**occasions** [1] - 42:13
**occur** [3] - 17:17, 28:7, 35:7
**occurred** [11] - 14:1, 14:2, 16:17, 17:25, 20:12, 31:16, 37:6, 37:23, 39:1, 45:5, 46:21
**occurring** [2] - 18:15, 36:25
**occurs** [2] - 4:7, 11:10
**October** [1] - 1:17
**OF** [2] - 1:1, 1:3
**offer** [1] - 4:3
**offered** [1] - 8:6
**offering** [2] - 7:11, 7:14
**Office** [3] - 1:10, 1:12, 9:17
**Officer** [1] - 48:9
**officer** [13] - 5:2, 13:16, 13:17, 19:1, 21:17, 24:5, 27:7, 28:3, 33:17, 34:15, 34:22, 41:12, 47:12
**officers** [8] - 17:22, 18:2, 18:7, 19:7, 23:7, 25:23, 28:5, 44:4
**officers'** [1] - 40:25
**officers/investigators** [1] - 18:13
**oftentimes** [1] - 25:4
**ON** [1] - 1:15
**once** [6] - 13:1, 14:7, 15:22, 31:24, 38:5, 39:19
**one** [10] - 6:4, 12:15, 16:11, 28:13, 29:2, 29:23, 31:7, 35:24, 42:7, 48:11
**open** [2] - 3:1, 50:3
**open-ended** [1] - 50:3
**opened** [1] - 37:19
**opening** [1] - 49:1
**operation** [1] - 17:14
**opportunity** [1] - 50:8

**opposed** [1] - 7:13
**Ordered** [1] - 1:21
**originally** [1] - 21:10
**ounce** [2] - 22:16, 22:17
**out-of-town** [1] - 46:22
**outside** [5] - 5:10, 25:4, 25:8, 26:8, 52:2
**overhear** [1] - 36:22
**overheard** [1] - 37:18
**overhearing** [1] - 41:1
**owned** [2] - 29:13, 29:14
**owner** [1] - 24:15

## P

**p.m** [2] - 30:3, 43:6
**package** [1] - 40:6
**page** [2] - 13:8
**PAGE** [2] - 2:2, 2:10
**pages** [1] - 20:21
**PAMurrayReporting@gmail.com** [1] - 1:25
**parked** [3] - 21:10, 21:11, 38:4
**parking** [2] - 31:11, 37:9
**part** [9] - 4:16, 9:24, 10:5, 28:16, 34:21, 35:2, 35:5, 35:24, 51:5
**parties** [4] - 4:10, 50:4, 54:7, 54:8
**partner** [8] - 35:10, 35:12, 36:21, 37:2, 38:4, 39:18, 39:21, 41:25
**passenger** [1] - 44:23
**passenger's** [1] - 39:20
**past** [1] - 10:13
**Patrice** [6] - 1:19, 1:23, 3:9, 54:2, 54:12, 54:13
**patrol** [3] - 34:15, 34:21, 39:25
**pause** [1] - 10:18
**PCAT** [2] - 34:2, 34:17
**people** [1] - 17:15
**perhaps** [1] - 48:22
**permission** [1] - 24:18
**permitted** [1] - 25:10
**person** [18] - 3:7, 11:14, 13:4, 13:15, 13:22, 14:15, 15:6, 19:15, 19:23, 24:4, 25:7, 26:10, 39:13, 39:24, 42:20, 43:14, 43:15, 44:10
**personally** [2] - 21:15, 21:16
**personnel** [1] - 12:23
**perspective** [1] - 52:13
**phone** [1] - 14:8
**physical** [1] - 20:25
**pick** [2] - 14:3, 20:1
**piece** [1] - 43:12
**place** [6] - 15:4, 20:8, 25:7, 42:20, 54:3, 54:6

**placed** [3] - 22:20, 23:1, 37:20
**Plaintiff** [1] - 1:4
**plan** [4] - 4:3, 4:5, 19:18, 23:8
**plate** [1] - 44:18
**PO** [2] - 1:24, 54:14
**point** [11] - 7:15, 7:25, 10:14, 12:11, 20:2, 20:22, 23:5, 29:23, 31:7, 39:22, 40:3
**points** [1] - 24:22
**poisonous** [1] - 50:24
**Police** [6] - 31:15, 33:19, 33:20, 33:24, 34:1, 34:3
**police** [4] - 23:7, 33:17, 34:4, 34:8
**portion** [1] - 5:5
**position** [5] - 4:23, 6:7, 6:12, 7:1, 34:14
**positioned** [1] - 18:22
**possession** [1] - 14:12
**possible** [1] - 46:12
**post** [8] - 49:10, 50:9, 50:15, 50:17, 51:3, 51:7, 52:5, 52:22
**post-hearing** [8] - 49:10, 50:9, 50:15, 50:17, 51:3, 51:7, 52:5, 52:22
**pound** [1] - 22:13
**predetermined** [1] - 12:21
**prefer** [1] - 7:6
**preliminarily** [1] - 8:13
**prepared** [1] - 3:21
**preparing** [1] - 50:21
**present** [1] - 8:11
**pretty** [1] - 11:17
**preview** [1] - 3:15
**previously** [1] - 4:5
**price** [1] - 10:13
**proactive** [2] - 34:4, 34:8
**probable** [9] - 4:15, 5:4, 5:24, 25:18, 25:22, 40:21, 40:24, 49:6, 50:19
**problem** [1] - 7:9
**procedure** [3] - 10:17, 12:24, 51:25
**procedures** [4] - 12:11, 12:18, 15:4, 26:9
**Proceedings** [1] - 53:4
**proceedings** [3] - 3:1, 54:4, 54:5
**process** [4] - 10:9, 11:6, 13:6, 28:6
**prompted** [1] - 31:4
**prong** [1] - 51:13
**property** [4] - 5:21, 43:1, 43:12, 43:17
**prove** [3] - 6:8, 6:9, 6:14
**provide** [3] - 39:8, 50:5
**provided** [8] - 35:12, 36:6, 36:18, 36:21, 38:21, 40:18, 41:19, 44:6

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 59 of 62

**pull** [3] - 9:6, 33:6, 47:19
**purchase** [29] - 12:12, 12:19, 14:2, 14:3, 14:17, 14:23, 15:1, 15:14, 15:19, 16:16, 17:1, 17:18, 19:6, 20:2, 20:12, 23:18, 24:6, 24:7, 27:17, 30:1, 31:16, 31:17, 35:18, 35:22, 36:1, 36:24, 38:3, 46:18, 46:20
**purchased** [2] - 10:12, 10:13
**purchases** [4] - 18:6, 26:16, 26:19, 34:18
**purpose** [2] - 28:16, 45:11
**pursuant** [1] - 47:6
**putting** [1] - 46:19

## Q

**quantity** [1] - 10:13
**questioning** [2] - 24:10, 24:25
**questions** [10] - 13:2, 26:23, 30:4, 32:7, 32:13, 41:5, 47:8, 47:12, 48:22, 49:20
**quickly** [1] - 38:25

## R

**radio** [8] - 18:3, 18:11, 21:3, 21:18, 23:6, 37:3, 37:15, 38:5
**radioed** [1] - 21:2
**radios** [2] - 18:19, 19:4
**raise** [3] - 9:1, 32:24, 49:19
**Rapids** [13] - 1:11, 1:18, 1:24, 15:23, 17:22, 20:22, 23:7, 31:15, 33:19, 33:20, 33:24, 35:6, 54:14
**RE** [2] - 2:5, 31:8
**RE-REDIRECT** [2] - 2:5, 31:8
**reach** [2] - 10:19, 14:7
**reached** [1] - 15:24
**read** [5] - 41:22, 41:24, 41:25, 43:21, 43:25
**reading** [1] - 42:3
**ready** [1] - 7:7
**realized** [1] - 50:22
**really** [1] - 48:21
**rear** [3] - 20:8, 21:14, 23:23
**reason** [2] - 45:10, 47:13
**reasons** [2] - 25:21, 29:2
**rebuttal** [1] - 52:21
**receive** [1] - 44:4
**received** [6] - 7:20, 8:20, 14:7, 20:4, 22:9, 44:5
**receiving** [1] - 20:5
**record** [5] - 5:19, 9:7, 33:7, 52:9, 54:5
**recovered** [1] - 23:23
**recross** [1] - 30:6
**red** [1] - 18:21

**REDIRECT** [6] - 2:4, 2:5, 2:7, 29:21, 31:8, 46:9
**redirect** [1] - 29:20
**reducing** [2] - 34:4, 34:11
**reentering** [1] - 26:2
**refer** [2] - 10:7, 18:19
**referring** [2] - 22:17, 22:18
**regard** [1] - 35:6
**regarding** [1] - 45:7
**registered** [1] - 29:15
**related** [4] - 16:12, 36:18, 37:3, 54:7
**relative** [1] - 54:8
**released** [1] - 28:14
**relevant** [3] - 10:2, 39:17, 40:5
**remain** [1] - 7:24
**remained** [1] - 39:19
**remember** [3] - 36:6, 40:14, 44:19
**report** [12] - 13:9, 13:25, 20:19, 20:20, 40:12, 45:7, 45:10, 45:14, 46:11, 46:12, 46:19, 47:13
**reported** [1] - 1:19, 54:4
**reporter** [2] - 9:13, 33:13
**Reporter** [4] - 1:20, 1:23, 54:2, 54:13
**REPORTER** [2] - 3:11, 34:6
**represented** [1] - 3:5
**requested** [1] - 39:21
**reserved** [1] - 6:22
**residential** [2] - 43:12, 43:17
**resistance** [3] - 6:20, 49:4, 52:24
**respect** [4] - 5:11, 5:22, 8:10, 50:2
**response** [1] - 7:12
**responsibilities** [1] - 35:25
**responsibility** [2] - 23:14, 23:16
**rest** [2] - 5:15, 5:16
**resulted** [1] - 32:3
**riding** [1] - 5:6
**RMR** [2] - 1:23, 54:13
**Road** [1] - 1:13
**Robert** [1] - 3:3
**Roberts** [1] - 54:3
**ROBERTS** [1] - 1:16
**role** [9] - 33:24, 34:12, 34:17, 34:21, 38:2, 38:5, 38:6, 47:22
**roll** [1] - 22:9
**rough** [1] - 42:15
**route** [1] - 15:23
**routine** [3] - 30:8, 51:23, 52:3
**rule** [1] - 51:12
**run** [1] - 51:23

## S

**S.E** [2] - 1:10, 1:18
**safety** [15] - 17:2, 17:5, 17:8, 17:20, 17:25, 19:10, 19:23, 35:6, 35:9, 35:16, 35:24, 36:4, 36:9, 36:17, 40:18
**saw** [2] - 21:6, 21:7
**scenario** [1] - 12:24
**scene** [2] - 23:12, 23:15
**schedule** [1] - 52:17
**seal** [7] - 7:21, 7:23, 8:3, 8:6, 8:8, 8:15, 8:19
**search** [66] - 4:14, 5:17, 6:11, 11:13, 13:3, 13:5, 13:11, 13:15, 13:18, 13:22, 13:23, 16:12, 24:4, 25:1, 25:7, 25:16, 25:17, 25:19, 26:9, 26:21, 27:5, 27:19, 27:24, 30:17, 30:18, 35:13, 35:14, 39:24, 40:1, 40:3, 40:13, 40:16, 40:21, 41:18, 41:22, 42:2, 42:4, 42:7, 42:10, 42:16, 42:19, 43:11, 43:22, 44:1, 44:3, 44:16, 44:25, 45:5, 45:11, 46:16, 46:17, 47:1, 47:2, 47:5, 47:6, 47:14, 49:5, 49:7, 49:23, 50:3, 50:18, 51:25, 52:2
**searched** [11] - 13:19, 14:13, 14:16, 19:16, 19:23, 23:21, 28:2, 28:3, 30:10, 42:20, 42:23
**searches** [4] - 11:11, 15:22, 19:14, 28:7
**searching** [1] - 15:5
**seat** [3] - 8:25, 32:22, 32:23
**seated** [2] - 9:5, 33:4
**second** [1] - 3:19
**see** [3] - 51:7, 51:17, 52:25
**seeing** [1] - 19:2
**sent** [1] - 20:16
**separate** [2] - 5:24, 18:7
**serving** [1] - 10:25
**set** [5] - 3:13, 10:20, 12:20, 52:15, 54:10
**setting** [1] - 52:17
**Seventh** [2] - 1:10, 1:17
**several** [1] - 36:7
**Shane** [8] - 3:3, 27:13, 35:3, 35:14, 37:4, 41:15, 44:10, 44:20
**SHANE** [1] - 1:6
**Sheriff's** [1] - 9:16
**shock** [2] - 28:22, 29:3
**short** [1] - 25:25
**Shorthand** [2] - 1:19, 54:2
**shorthand** [2] - 1:20, 54:4
**shot** [1] - 30:23
**sic** [2] - 11:16, 38:2

**side** [2] - 38:20, 39:20
**sides** [1] - 49:11
**sight** [1] - 14:10
**signaturing** [1] - 11:16
**signed** [6] - 10:9, 12:2, 12:10, 25:17, 27:14, 35:14
**signs** [1] - 11:23
**similar** [2] - 17:20, 17:24
**similarly** [1] - 26:6
**simultaneous** [1] - 32:4
**Sink** [1] - 13:11
**situations** [1] - 18:14
**Skylar** [1] - 3:21
**someone** [1] - 38:14
**sometime** [1] - 49:15
**sometimes** [1] - 43:4
**soon** [1] - 14:4
**sorry** [6] - 20:20, 23:20, 30:16, 31:18, 34:6, 44:21
**sort** [2] - 6:16, 13:7
**source** [26] - 10:6, 11:15, 12:3, 14:2, 16:5, 16:6, 16:7, 19:12, 20:16, 20:23, 21:5, 22:6, 22:11, 22:17, 22:18, 26:15, 30:21, 31:10, 31:13, 31:18, 32:1, 32:4, 37:12, 37:16, 37:17
**source's** [2] - 31:19, 31:21
**sources** [2] - 11:2, 28:10
**spare** [3] - 20:9, 40:11
**speaking** [1] - 39:18
**specific** [12] - 10:19, 13:17, 16:21, 19:1, 19:2, 22:4, 26:19, 35:17, 40:9, 43:6, 45:1, 50:21
**specifically** [7] - 14:1, 26:22, 37:24, 41:2, 44:9, 44:12, 44:16
**speed** [1] - 13:5
**spell** [2] - 9:12, 33:12
**stage** [1] - 51:2
**staggered** [1] - 52:17
**stamp** [1] - 18:14
**stand** [1] - 8:24
**standing** [9] - 5:24, 6:8, 6:14, 7:2, 7:9, 7:12, 8:9, 8:10, 49:3
**started** [3] - 3:13, 3:15, 6:21
**starting** [1] - 14:5
**state** [4] - 9:12, 10:16, 25:10, 33:12
**State** [2] - 12:6, 54:2
**statement** [3] - 14:14, 22:13, 24:2
**statements** [1] - 5:1
**STATES** [2] - 1:1, 1:3
**States** [5] - 1:11, 3:3, 3:4, 3:5, 8:21
**stating** [3] - 11:15, 22:8, 22:9
**stay** [1] - 23:16
**step** [2] - 38:22, 39:21
**steps** [1] - 28:13

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 60 of 62

**still** [4] - 4:19, 34:12, 34:21, 52:1
**stolen** [1] - 43:1
**stood** [1] - 38:23
**stop** [49] - 8:25, 17:10, 17:17, 19:19, 23:8, 23:11, 23:20, 24:1, 25:18, 28:17, 28:23, 28:25, 30:17, 31:1, 31:18, 31:25, 32:23, 36:1, 37:5, 37:23, 38:2, 38:6, 38:15, 38:17, 38:19, 38:24, 38:25, 40:13, 40:17, 40:21, 41:12, 41:16, 41:19, 42:14, 45:4, 45:7, 45:11, 45:25, 46:3, 46:25, 47:5, 47:14, 47:16, 47:19, 47:22, 47:24, 49:9, 49:22, 51:22
**stop/the** [1] - 6:10
**stopped** [5] - 18:21, 24:12, 30:22, 32:1, 37:19
**stopping** [2] - 45:2, 45:20
**stops** [1] - 32:4
**store** [2] - 21:8, 31:12
**story** [2] - 12:9, 38:21
**strip** [2] - 11:13, 13:11
**subcomponent** [2] - 51:10, 51:12
**subheadings** [1] - 51:14
**successful** [1] - 16:11
**supply** [4] - 20:23, 21:5, 22:6, 37:12
**support** [1] - 49:2
**supported** [1] - 50:19
**supposed** [1] - 35:21
**SUPPRESS** [1] - 1:15
**suppress** [1] - 3:8
**suppression** [1] - 4:8
**surprise** [2] - 29:1, 30:17
**surprise-stop** [1] - 30:17
**surprisingly** [1] - 49:16
**surveillance** [4] - 20:25, 23:3, 37:4, 40:25
**surveilling** [1] - 46:24
**suspects** [1] - 28:10
**suspended** [1] - 29:11
**SUV** [3] - 27:21, 36:16, 44:17
**sworn** [2] - 9:3, 33:2
**synopsis** [1] - 44:5
**system** [2] - 18:8, 18:11

**T**

**table** [1] - 51:8
**talk** [3] - 3:14, 18:3, 18:4
**talked** [2] - 11:6, 28:1
**talkie** [2] - 36:21, 37:2
**talkies** [3] - 18:16, 37:1, 37:8
**talking** [1] - 19:6
**Tanner** [3] - 3:18, 8:22, 9:14
**TANNER** [3] - 2:3, 9:2, 9:14

**target** [5] - 15:24, 16:3, 17:10, 17:12, 30:21
**task** [4] - 9:18, 9:24, 25:3
**Task** [3] - 9:19, 9:21, 10:20
**Team** [2] - 34:1, 34:3
**team** [1] - 35:2
**technical** [1] - 3:9
**technique** [1] - 46:12
**tell** [1] - 28:22
**telling** [1] - 20:17
**term** [1] - 16:16
**terms** [16] - 7:4, 10:23, 14:1, 15:4, 17:25, 19:18, 21:6, 22:13, 37:7, 37:15, 38:18, 43:22, 46:11, 46:12, 46:18, 46:19
**testified** [2] - 9:4, 33:3
**testing** [1] - 29:6
**text** [5] - 14:8, 18:12, 20:14, 20:17, 21:20
**THE** [67] - 1:1, 1:1, 1:16, 3:2, 3:12, 4:1, 4:7, 5:7, 5:15, 6:15, 6:21, 7:8, 7:14, 7:17, 7:19, 7:21, 7:24, 8:7, 8:16, 8:18, 8:23, 9:5, 26:25, 29:19, 30:5, 30:8, 30:11, 30:12, 30:14, 30:16, 30:20, 30:25, 31:1, 31:3, 32:8, 32:14, 32:16, 32:17, 32:21, 33:4, 34:8, 41:7, 46:7, 47:9, 47:12, 47:17, 47:18, 47:21, 47:23, 48:1, 48:2, 48:3, 48:4, 48:7, 48:9, 48:13, 48:17, 48:20, 49:17, 49:19, 50:10, 50:13, 51:6, 51:17, 52:12, 52:16, 53:2
**themselves** [1] - 18:3
**thoughts** [4] - 6:16, 50:4, 50:7, 50:14
**thread** [1] - 21:21
**three** [2] - 23:13, 26:6
**throughout** [3] - 10:7, 12:18, 14:22
**time-stamp** [1] - 18:14
**tipped** [1] - 32:1
**tire** [4] - 20:9, 22:21, 23:24, 40:11
**TO** [1] - 1:15
**today** [5] - 5:14, 6:17, 10:7, 50:6
**together** [2] - 27:14, 29:25
**took** [2] - 10:9, 12:18
**town** [2] - 35:22, 46:22
**tracker** [1] - 24:8
**traffic** [40] - 6:10, 17:10, 17:17, 19:18, 23:8, 23:11, 23:20, 24:1, 25:18, 28:17, 28:23, 28:24, 30:22, 31:18, 31:25, 32:1, 32:4, 36:1, 37:3, 37:5, 37:15, 37:22, 38:2, 38:5, 38:6, 38:15, 38:17, 38:19, 40:17, 41:12, 41:15, 41:19,

42:14, 45:4, 45:7, 45:11, 45:18, 45:25, 46:3, 47:5
**transaction** [16] - 11:9, 11:12, 11:14, 12:21, 12:25, 13:10, 13:20, 13:21, 18:15, 18:23, 20:14, 22:2, 26:13, 28:8, 28:9, 45:15
**transactions** [1] - 10:15
**transcribed** [1] - 54:4
**Transcript** [2] - 1:21, 1:21
**transcript** [1] - 54:5
**transmitter** [1] - 11:17
**travel** [3] - 19:25, 23:4
**traveling** [2] - 18:20, 20:22
**Tree** [1] - 21:8
**tree** [1] - 50:24
**true** [2] - 30:10, 54:5
**trunk** [6] - 22:21, 23:2, 37:19, 40:8, 40:9, 40:11
**truth** [1] - 4:21
**try** [3] - 16:2, 46:12, 50:17
**trying** [1] - 32:2
**turn** [1] - 18:21
**turned** [1] - 51:18
**two** [5] - 3:17, 6:22, 23:13, 28:5, 39:2
**type** [1] - 38:8
**typical** [1] - 11:9
**typically** [1] - 10:16

**U**

**U.S** [1] - 1:10
**unable** [1] - 3:24
**unaware** [1] - 29:4
**under** [9] - 7:21, 7:23, 8:3, 8:6, 8:7, 8:15, 8:19, 23:17, 25:10
**underneath** [1] - 20:9
**Unit** [1] - 34:3
**unit** [2] - 34:18, 34:24
**UNITED** [2] - 1:1, 1:3
**United** [5] - 1:11, 3:3, 3:4, 3:5, 8:21
**unknown** [2] - 25:24, 30:21
**unless** [1] - 52:20
**unsuccessful** [2] - 15:18, 30:1
**unsure** [2] - 29:6, 29:12
**up** [21] - 3:13, 8:1, 9:7, 10:9, 10:20, 12:2, 12:10, 12:20, 13:5, 14:3, 20:1, 30:23, 33:6, 49:9, 49:10, 49:12, 49:15, 50:6, 52:5, 52:17
**upset** [1] - 28:21
**use** [1] - 10:5
**using** [1] - 1:20
**utilize** [2] - 12:12, 18:16
**utilizing** [1] - 11:7

**V**

**valid** [1] - 47:2
**validity** [2] - 4:14, 5:11
**various** [1] - 42:17
**vehicle** [72] - 4:14, 4:18, 5:5, 11:11, 13:5, 13:20, 13:22, 14:13, 14:15, 15:5, 16:20, 19:15, 19:22, 21:7, 21:14, 22:12, 22:20, 23:9, 23:19, 23:20, 24:8, 24:11, 24:15, 24:18, 24:20, 24:23, 25:19, 25:25, 26:2, 26:10, 27:20, 28:1, 28:6, 29:13, 29:15, 31:19, 32:5, 35:14, 36:5, 36:10, 36:13, 37:20, 38:9, 38:12, 38:23, 39:13, 39:25, 40:2, 40:3, 40:13, 40:21, 41:13, 44:13, 44:16, 44:20, 44:22, 45:1, 45:16, 45:19, 45:20, 47:19, 47:24, 49:5, 49:7, 49:14, 49:23, 50:3, 50:19, 51:22, 51:24
**vehicles** [2] - 16:21, 36:7
**verbiage** [1] - 44:20
**versus** [1] - 3:3
**via** [2] - 14:8, 14:24
**view** [1] - 21:17
**violations** [1] - 45:18
**violence** [1] - 34:11
**visit** [1] - 4:11
**VS** [1] - 1:5

**W**

**wait** [2] - 16:1, 16:8
**waited** [1] - 38:23
**walkie** [5] - 18:16, 36:21, 37:1, 37:2, 37:8
**walkie-talkie** [2] - 36:21, 37:2
**walkie-talkies** [3] - 18:16, 37:1, 37:8
**wall** [1] - 46:13
**walling** [1] - 46:18
**Walmart** [1] - 37:9
**want** [16] - 3:14, 4:11, 15:12, 24:11, 27:5, 30:24, 33:6, 48:21, 49:9, 51:19, 52:4, 52:8, 52:14, 52:15, 52:24, 52:25
**wanted** [1] - 22:15
**warned** [1] - 28:24
**warrant** [55] - 4:8, 4:14, 4:16, 4:18, 4:20, 5:1, 5:5, 5:11, 5:17, 5:21, 6:11, 16:12, 16:19, 25:7, 25:16, 25:17, 27:5, 27:7, 27:9, 27:14, 27:15, 27:19, 27:24, 29:24, 35:13, 40:1, 40:14, 40:16, 40:19, 40:20, 41:18, 41:22, 42:4, 42:7,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR    Document 43    Filed 01/03/25    Page 61 of 62

42:19, 43:11, 43:22, 44:1,
44:3, 44:7, 44:17, 45:1, 45:5,
45:12, 46:16, 46:17, 47:1,
47:2, 47:6, 47:14, 47:16, 49:6,
49:24, 50:18
  **warrant's** [1] - 5:23
  **warrants** [4] - 25:1, 42:2,
42:10, 42:16
  **wash** [2] - 21:10, 21:11
  **WASSMER** [28] - 1:12, 2:4,
2:6, 4:4, 4:25, 6:18, 7:10,
7:16, 7:22, 8:1, 8:17, 27:2,
27:4, 29:17, 30:7, 32:13, 41:9,
41:11, 46:5, 47:11, 48:8,
48:19, 49:16, 49:18, 50:8,
50:12, 52:14, 52:19
  **Wassmer** [19] - 1:12, 3:7,
4:1, 4:24, 6:15, 7:8, 27:1,
29:19, 32:10, 32:11, 41:8,
46:7, 47:10, 48:7, 48:17,
48:25, 50:7, 51:20, 52:12
  **watching** [1] - 40:25
  **ways** [1] - 42:17
  **wear** [1] - 11:16
  **wearing** [1] - 15:8
  **WEBB** [1] - 1:12
  **Webb** [1] - 3:7
  **week** [4] - 6:5, 50:12, 52:15,
52:16
  **WhatsApp** [2] - 18:12, 21:21
  **WHEREOF** [1] - 54:10
  **whole** [1] - 49:23
  **Wi** [1] - 3:10
  **Wi-Fi** [1] - 3:10
  **willing** [2] - 10:15, 11:11
  **window** [1] - 39:19
  **Winslow** [1] - 1:13
  **wire** [3] - 14:24, 15:9, 21:23
  **wish** [2] - 7:24, 8:11
  **wished** [1] - 10:24
  **witness** [6] - 8:24, 9:3,
26:24, 32:18, 33:2, 41:6
  **WITNESS** [12] - 2:2, 30:11,
30:14, 30:20, 31:1, 32:16,
34:8, 47:17, 47:21, 48:1, 48:3,
54:10
  **witnessed** [1] - 25:24
  **witnesses** [2] - 3:18, 4:6
  **Word** [1] - 51:14
  **work** [5] - 15:14, 25:3, 34:4,
34:8, 53:1
  **working** [3] - 10:23, 11:20,
38:14
  **write** [1] - 24:2
  **writing** [2] - 46:11, 46:12
  **written** [1] - 53:1
  **wrote** [1] - 40:12

## Y

  **year** [1] - 33:24
  **years** [2] - 9:22, 33:22
  **yourself** [4] - 19:11, 19:15,
22:1, 23:5

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 1:24-cr-00070-CJW-MAR     Document 43     Filed 01/03/25     Page 62 of 62